CLAY, Circuit Judge,
dissenting.
Because the majority, like the district court below, usurps the role of the jury and violates the plain dictates of Federal Rule of Civil Procedure 56,1 dissent.
I.
My disagreement begins with the majority’s holding that Officer Matthew Bain’s initial traffic stop of Joseph Gaddis complied with the Fourth Amendment as a matter of law. Most appellate review of a district court’s determination about the propriety of a traffic stop arises on direct criminal appeal after a district court has denied a motion to suppress evidence discovered after the stop. In that procedural posture, the Court upholds the district court’s findings of fact regarding the existence of probable cause “unless clearly erroneous,” and the district court’s legal conclusion as to the existence of probable cause is reviewed de novo. United States v. Hill, 195 F.3d 258, 264 (6th Cir.1999); see also Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). By contrast,’ in a § 1983 action on appeal from the grant of a summary judgment against the plaintiff, the Court reviews both the district court’s factual assessments (i.e., whether there are genuine issues of material fact) and the legal conclusions under a de novo standard. See Pyles v. Raisor, 60 F.3d 1211, 1215 (6th Cir.1995) (“In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible.”) (citing Yancey v. Carroll County, 876 F.2d 1238, 1243 (6th Cir.1989)). Although the majority opinion states that “we must resolve disputes of fact in favor of the nonmoving party, Gaddis, drawing all inferences in his favor,” Op. at 766 (citing Burchett v. Kiefer, 310 F.3d 937, 941-42, 945 (6th Cir.2002)), the remainder *778 of the opinion reveals that the majority has simply paid lip service to this bedrock principle of summary judgment law.
The failings of the majority opinion begin with its description of the allegedly undisputed facts that preceded Officer Bain’s initial traffic stop of Gaddis. This much is undisputed: Gaddis was driving his car shortly before 4:00 a.m. on April 12, 1999, in Redford Township, when Officer Bain spotted Gaddis’ car while patrolling alone on Telegraph Road. It is also undisputed that Officer Bain’s patrol car created a video, but not an audio, record of Bain’s counter with Gaddis. It is not undisputed, however, that Bain saw Gaddis “weaving” within his traffic lane. Op. at 766. According to the Oxford English Dictionary, “weave” means to “move repeatedly from side to side; to toss to and fro; to sway the body alternately to one side and the other; to pursue a devious course, thread one’s way amid obstructions.” Oxford English Dictionary Online Edition (taken from second print edition 1989) (emphasis in original). Webster’s Dictionary defines “weave” to mean “to direct (as the body) in a winding or zigzag course esp. to avoid obstacles.” Webster’s Third New Int’l Dictionary 2591 (1993). The videotape evidence does not show — or at least a reasonable jury would not be compelled to conclude — that Gaddis moved repeatedly side to side or that he was driving his car on a zigzag course. Rather, the tape shows Gaddis gradually veering within his lane on two occasions, barely touching (but not crossing) the white line separating his lane from the lane traveling in the same direction. Thus, there is a significant dissonance between Bain’s characterization of Gaddis’ driving (weaving) and what the videotape actually reveals (a gradual drifting to the lane marker on two occasions).
Bain’s credibility regarding Gaddis’ alleged weaving is undermined not only by the videotape, but also by his 1999 conviction for third degree criminal sexual conduct for which Bain currently is serving a prison term of 42 months to 15 years. See Fed.R.Evid. 609(a)(1) (providing that evidence that a witness has been convicted of a crime punishable by imprisonment in excess of one year shall be admitted if its probative value outweighs its prejudicial effect). Although ultimately it is within the district court’s discretion to admit evidence of a prior criminal conviction for impeachment purposes, Bain’s conviction arguably tends to undermine the testimony of the most significant defense witness in this case as to all material issues.
The majority next accepts as undisputed fact Bain’s testimony that Gaddis had been “driving somewhat slowly,” a fact the majority declares to be supported by the ears passing Gaddis in the other lane. Op. at 766-67. There is no evidence, however, that Gaddis was traveling under the speed limit, nor is it undisputed that his speed was so slow as to suggest that he may have been under the influence of alcohol. Cf. United States v. Little, No. 97-6200, 1999 WL 196515, at *1 (6th Cir. Mar.24, 1999) (noting that trooper suspected defendant was a drunk driver “[bjecause intoxicated drivers commonly travel at excessively high or low speeds”) (emphasis added). In fact, Bain testified that he has no recollection of what the other cars were doing on the night in question, suggesting that the relative speed of Gaddis’ car did not inform Bain’s decision to stop Gaddis at all. See United States v. Ferguson, 8 F.3d 385, 392 (6th Cir.1993) (en banc) (“We note that this probable cause determination, like all probable cause determinations, is fact-dependent and will turn on what the officer knew at the time he made the stop.”) (emphasis in original). Further, it reasonably could be inferred from the videotape that cars were passing Gad-dis because he was traveling at or near the speed limit and the other drivers were *779 exceeding the speed limit. Consistent with this inference, Officer Bain admits that he never saw Gaddis violate any provision of the Michigan Motor Vehicle Code. Thus, there is a genuine issue of material fact as to whether Gaddis was traveling at an excessively slow speed that reasonably would have suggested drunk and/or careless driving.
The majority next states that Bain testified that he “saw Gaddis slumping to the right inside his car as he held the wheel.” Op. at 766-67. The Oxford English Dictionary defines “slump” to mean to “slide off heavily; to plump down; to fall or collapse clumsily or heavily.” Oxford English Dictionary Online Ed. (emphasis in original). However, Bain did not testify that Gaddis was slumping or that he appeared to be in a state of fall or collapse. He actually testified that he saw Gaddis “leaning over to the right,” but that he “couldn’t see into the car to see what he was doing.” (J.A. 567.) Although “leaning” and “slumping” arguably fall along the same continuum, there is a world of difference between the two physical states. Drivers frequently lean in their cars when adjusting the radio or reaching for a cigarette lighter or a cellular telephone. Some drivers are just more comfortable or may even enjoy driving with a leaning posture. Although such leaning is not inconsistent with intoxication, it also is not inconsistent with a host of other innocent causes. By transforming Gaddis’ lean into a “slump,” the majority continues its incremental stacking of the “undisputed” facts against Gaddis. Moreover, as acknowledged by the majority and the district court below, the tape does not show Gaddis’ posture at all, another fact that bears directly on the credibility of Bain, who testified not only that he saw Gaddis leaning, but that the tape “could pick that up.” It is inexplicable, then, why the majority not only ignores the absence of “leaning” evidence on the videotape but also embellishes Bain’s testimony. The far more judicious tact would be to acknowledge that a reasonable inference from the absence of “leaning” evidence is that Gaddis was not leaning at all.
According to the majority, Bain’s purported observation of Gaddis’ “weaving,” slow driving speed and “slumping” led Bain to suspect that Gaddis had been driving drunk. Op. at 766-67. This is only partially true. Bain testified that he thought Gaddis “was driving carelessly, and [he] thought [Gaddis] might be intoxicated.” (J.A. 568.) (emphasis added). Thus, Bain suspected that Gaddis might be violating two provisions of the Michigan Motor Vehicle Code Mich. Comp. Laws § 257.625 (prohibiting operation of vehicle while under the influence of alcoholic liquor) and § 257.626b (prohibiting careless or negligent driving).
In Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), the Supreme Court held, “As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.” Id. at 810, 116 S.Ct. 1769 (citations omitted). The Court further characterized the probable cause standard for suspected traffic law violations as “the normal one,” the “traditional justification” and “the usual rule.” Id. at 810, 817, 116 S.Ct. 1769 (emphasis omitted), 517 U.S. at 818, 116 S.Ct. 1769. Our Court, sitting en banc, similarly held that “so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful.” Ferguson, 8 F.3d at 391; accord United States v. Freeman, 209 F.3d 464, 466 (6th Cir.2000) (following Ferguson); Hill, 195 F.3d at 264 (“[A]n officer may stop a vehicle for a traffic violation ... as long as the officer had probable cause to initially stop the vehicle.”) (citing Whren). Despite these clear statements by the Supreme *780 Court and our own en banc Court, the majority opines that it is unsettled in this circuit as to whether the police need probable cause to stop a vehicle for a suspected traffic law violation. Op. at 771 n. 6. The majority appears to base its reasoning on the ground that the Whren opinion fails to state explicitly that the decision to stop an automobile is reasonable only when the police have probable cause to believe that a traffic violation has occurred. See Op. at 769 n. 4 (“Indeed, Whren did not even hold that all stops premised on a civil traffic violation require probable cause.... ”). This reading of Whren, however, ignores the context of the Supreme Court’s above-quoted statement, which was a response to the petitioner’s argument that “ ‘in the unique context of civil traffic regulations’ probable cause is not enough.” Whren, 517 U.S. at 810, 116 S.Ct. 1769. Although the Court refused to adopt a more stringent constitutional standard than probable cause for suspected traffic law violations, the Court gave no indication that in fact a lesser constitutional standard applies. To the contrary, at the conclusion of its opinion, the Court stated:
For the run-of-the-mine case, which this surely is, we think there is no realistic alternative to the traditional common-law rule that probable cause justifies a search and seizure. Here the District Court found that the officers had probable cause to believe that petitioners had violated the traffic code. That rendered the stop reasonable under the Fourth Amendment....
Id. at 818-19, 116 S.Ct. 1769. Because it is settled that probable cause is required for suspected civil violations of the traffic laws, Officer Bain clearly needed probable cause to stop Gaddis on suspicion of careless driving. Cf. United States v. Ervin, 59 Fed. Appx. 631, 635 (6th Cir.2003) (holding that officer needed probable cause to stop driver for violating Florida’s careless driving statute).
Ignoring Officer Bain’s careless driving justification for the stop, the majority holds that Bain needed only a reasonable suspicion that criminal activity was afoot before he could stop Gaddis on suspicion of drunk driving because drunk driving is a criminal offense in Michigan. Op. at 768-69. See also Mich. Comp. Laws § 257.625(9)(a) (providing that a person who operates a vehicle while intoxicated “is guilty of a misdemeanor”). As support, the majority opinion cites United States v. Arvizu, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), Alabama v. White, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) and United States v. Hensley, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604, (1985). Op. at 768. None of these cases is relevant, however, because none of the suspected crimes in those cases bore an inherent connection to the operation of a motor vehicle, and none involved a suspected violation of the traffic laws. See Arvizu, 534 U.S. at 272, 273, 122 S.Ct. 744 (minivan stopped on suspicion that narcotics were being smuggled); White, 496 U.S. at 327, 110 S.Ct. 2412 (vehicle stopped due to anonymous tip that driver had been transporting drugs); Hensley, 469 U.S. at 223-24, 105 S.Ct. at 677-78 (vehicle stopped on suspicion that the driver was wanted for armed robbery). By contrast, drunk driving necessarily involves the operation of a motor vehicle and constitutes a violation of the traffic laws. Under Michigan law, the drunk driving prohibition, like the civil prohibition against speeding, is located within Chapter VI of the Michigan Motor Vehicle Code, entitled in conspicuous type, “OBEDIENCE TO AND EFFECT OF TRAFFIC LAWS.”
Subjecting careless driving and drunk driving to different constitutional standards makes no sense legally and prac *781 tically. Stops for both types of violations generally are premised on an officer’s observations, “which afford the ‘quantum of individualized suspicion’ necessary to ensure that police discretion is sufficiently constrained.” Whren, 517 U.S. at 817-18, 116 S.Ct. 1769 (quoting Delaware v. Prouse, 440 U.S. 648, 654-55, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); internal quotation marks and citation omitted). The mere fact that the respective penalties for careless driving versus drunk driving deem the former a civil violation and the latter a crime has no bearing whatsoever on the manner in which police officers detect these violations. Moreover, different standards for these two traffic violations might encourage police officers to avoid the higher constitutional standard applicable to stops for careless driving, speeding, failing to signal, etc. by “tacking on” a drunk driving suspicion. In many instances, the majority’s reasonable suspicion standard for drunk driving could swallow the probable cause standard applicable to all other traffic law violations.
Because the Supreme Court (in Whren) and this Court [en banc decision in Ferguson) clearly have held that a stop for suspected traffic violations must be premised on probable cause and because there is no legal or practical basis to subject drunk driving to a different constitutional standard than other suspected traffic violations, this Court should follow the panel decisions of our Court that relied on Whren and/or Ferguson in applying a probable cause standard to suspected drunk driving. See Freeman, 209 F.3d at 467 (applying Ferguson’s probable cause standard in holding that officer lacked probable cause to stop vehicle for suspected drunk driving); United States v. Palomino, 100 F.3d 446, 448 n. 1 (6th Cir.1996) (applying Whren’s probable cause standard to challenge to traíña stop for suspected drunk driving; affirming district court’s holding that the officer had probable cause to believe that the traffic violation of driving while intoxicated had occurred); accord United States v. Carlton, 44 Fed. Appx. 720, 722 (6th Cir.2002) (holding that officer had probable cause to suspect drunk driving based on “erratic driving”); United States v. Little, No. 97-6200, 1999 WL 196515, at *4 (6th Cir. Mar. 24.1999) (holding that the totality of the circumstances created probable cause to believe that the defendant had been driving drunk). To the extent United States v. Roberts, 986 F.2d 1026, 1029 (6th Cir.1993) adopted a reasonable suspicion standard for drunk driving stops, Whren and Ferguson have abrogated that case.
As previously discussed, there is a genuine issue of material fact as to whether Gaddis had been leaning in his car and, if so, to what extent. There also is a genuine issue of material fact as to whether Gaddis had been driving at a speed so excessively slow as to be indicative of impaired driving. Thus, the only undisputed fact is that Gaddis’ car gradually drifted toward and eventually touched the painted hashes on two occasions. This fact alone does not create probable cause to suspect, or even a reasonable suspicion of, drunk driving as a matter of law. Cf. Freeman, 209 F.3d at 466 (“If failure to follow a perfect vector down the highway or keeping one’s eye on the road were sufficient reasons to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of their privacy.”) (internal quotation marks and citations omitted). Cases finding probable cause to arrest for drunk driving have required more indicia of impaired driving than two instances of a gradual drifting onto a lane marker. See, e.g., Palomino, 100 F.3d at 448 (holding drunk driving stop to be constitutional where driver had been traveling significantly under the speed limit, had crossed two lanes of traffic at once, had straddled *782 the right lane, and had been weaving back and forth between the right lane and the emergency lane); Carlton, 44 Fed. Appx. at 722 (holding drunk driving stop to be constitutional where driver had “weaved from side to side at least three times on” two different streets); Little, 1999 WL 196515, at *4 (holding drunk driving stop to be constitutional where driver had been traveling at “an unusually slow speed,” had allowed her speed to fluctuate, and had weaved on the highway’s shoulder). I do not foreclose the possibility that a jury might find probable cause if it were to find that Gaddis was not in control of his vehicle, as evidenced by leaning, slouching and/or an excessively slow speed. It simply is my position that this Court lacks the authority to usurp the jury’s role in finding the facts that may support such a legal conclusion.
II.
Gaddis’ excessive force claim centers around the batteries he suffered after Officer Bain had pulled him over for suspected traffic violations, most significantly the 16 bullets that Officers Bain and Duffany fired at Gaddis. The key circumstance that precipitated the shooting was the alleged belief of at least two of the officers that Gaddis had had a knife in his hand. As the majority opinion notes, “If a reasonable jury could find that Gaddis did not have a knife, then it could unquestionably go on to find that shooting him was unconstitutionally excessive force ... and the grant of summary judgment would have to be reversed.” Op. at 772-73 (citation omitted; emphasis in original). As discussed below, a reasonable jury should be permitted to make just such a finding and, therefore, the summary judgment should be reversed.
After Gaddis finally stopped his car, Officer Bain drew his gun and approached. Bain then re-holstered his gun and pulled out his flashlight. After a delay, Gaddis passed a piece of paper to Bain who looked at it and stuffed it in his pocket. Soon, Officers Burdick and Duffany arrived in their car. Gaddis then exited his car and put his hands in his pockets. Bain briefly grabbed Gaddis by the collar and pulled Gaddis toward him. Shortly thereafter, Gaddis removed his hands from his pockets. According to Bain and Burdick, they saw a knife in Gaddis’ hand. Burdick described the knife as “large,” “long,” and “the biggest knife [he] had ever seen.” Bain’s testimony conflicts with Burdick’s in that Bain saw only a small knife. Duffany saw something shine, but he did not know what it was. Bain then pulled his gun on Gaddis, as did Burdick. Duffany pulled his gun in response to Bain’s reaction in pulling his gun. Officer Paul Champoux, who had arrived on the scene around this time, testified that he could not tell if Gaddis had anything in his hand. Nevertheless, he “racked” a shell into the chamber of his shotgun and leveled it at Gaddis in order to “startle” Gaddis.[1] The knife that Defendants claimed to have recovered from Gaddis was less than three inches long.
If all of the officers had seen Gaddis with a knife, but happened to disagree about the knife’s length, there would be no genuine dispute as to whether Gaddis had been brandishing a knife. Here, however, two of the officers could not determine what Gaddis had been holding, even though another officer testified that Gad-dis had wielded a large and long knife. Thus, the officers’ credibility is open to question, particularly that of Bain, a con *783 victed criminal. Moreover, as discussed below, there are several additional pieces of evidence that further undermine the officers’ claim that Gaddis had been holding a knife.
First, there is no physical evidence of the stab wound Gaddis allegedly inflicted on Officer Burdick. Officer Burdick testified that Gaddis had stabbed him in the back while Burdick had been attempting to place Gaddis in a headlock. Burdick, who had been wearing a flak jacket at the time, claims to have suffered a cut on his back that resulted in a circle of blood soiling his white t-shirt. The bloody t-shirt, however, was not preserved as evidence at the crime scene, and its whereabouts are unknown. The police shirt that Burdick wore over the t-shirt was preserved in evidence, but had no blood on it.[2] The back of the flak jacket, where Burdick allegedly had been stabbed bore only a “speck” — sized hole, and Burdick has no scar from the alleged knife attack. This utter lack of physical evidence of a stab wound, particularly when combined with the fact that no officer preserved Burdick’s purported blood-soaked t-shirt, in derogation of proper investigative practice,[3] tends to undermine Burdick’s testimony that he had suffered a stab wound from Gaddis. A reasonable inference from the lack of a stab wound is that Gaddis had not been holding a knife when he struck Burdick.
Second, there is no reliable physical evidence linking Gaddis to the knife that Defendants attribute to Gaddis. Jeffrey Wanbaugh, the evidence technician who arrived on the scene after Gaddis had been shot, was apprised by an officer that Gad-dis allegedly had been wielding a knife and had stabbed Burdick. Wanbaugh testified that he discovered a set of car keys and a leather sheath lying on the front driver’s seat of Gaddis’ car, but that he did not know when either of those items had been placed on the seat, nor by whom. He also testified that he had wanted to see what was inside of the sheath and discovered a knife inside. Although Wanbaugh photographed this knife, he did not take it into evidence. Wanbaugh further testified that he collected a second knife on the ground and about four feet from Gaddis’ car. An officer on the scene told Wanbaugh that Gaddis had used this knife to strike Bur-dick.
Despite the manifest importance of this second knife, Wanbaugh did not collect it until he had been on the scene for a half an hour. And although Wanbaugh took the second knife into evidence, he made no attempt to determine whether it bore the fingerprints of Gaddis or the police officers. He simply took the word of an officer on the scene that Gaddis had used the knife to strike Burdick. Wanbaugh’s failure to fingerprint and establish a reliable chain of custody for this second knife, combined with the fact that he never took the first knife into evidence, can support the reasonable inferences that (1) Gaddis actually had possessed only one knife, the one recovered from inside of his car, and (2) the second knife, which was neither fingerprinted nor tested for blood, may have been planted at the scene by one of the officers.
Third, a reasonable jury could conclude that the videotape does not show Gaddis holding a knife. The majority opinion concedes that, when viewing the videotape, a knife cannot be discerned in Gaddis’ hand. Op. at 773-74 (‘While the tape would not enable a juror directly to verify the pres *784 ence of a knife, it equally would not permit him or her to conclude that there was no knife.”)- Combined with the other evidence that undermines the officers’ credibility, one reasonable inference is that Gaddis did not have a knife in his hand at the time. The majority explains away this inference as well. Employing colorful descriptions that could be more appropriately presented in Defendants’ closing argument to the jury, the majority zeroes in on “the body language of the actors during the encounter,” concluding that “the officers’ reactions powerfully corroborate” the conclusion that Gaddis had a knife. Id. The majority first points to the fact that Bain jumped back “in obvious alarm” after Gaddis had removed his hands from his pocket and argues that this reaction is “inexplicable unless something threatening was in Gaddis’ hands.” Id. I agree that the tape arguably supports such an inference, but it is not the only inference that explains Bain’s body language. The tape also supports the inference that Bain was concerned that Gaddis was going to strike him with his empty fist or with his car keys or with a stick of foil-wrapped chewing gum or any other harmless object that might glisten in the dark. Bain’s movements also would support the inference that Bain was not alarmed at all, but that he had become angry or frustrated with Gaddis and wanted to escalate the confrontation by drawing his gun.
As additional “body language” evidence, the majority opinion points to the “windmilling motion” that Gaddis used to strike at Burdick after Burdick had attempted to jump Gaddis from behind. Op. at 773-74. Without citation and without the benefit of any expert testimony, the majority concludes as a matter of law that this motion is “suggestive of a knife stab.” Id. This windmilling motion, however, also is suggestive of striking someone with a fist or of an involuntary, reflexive attempt to protect oneself from a surprise attack. It is wholly inconsistent with Rule 56 for my colleagues to adjudicate this issue against Gaddis simply because he did not swing his arm in a manner consistent with their imaginations. The inference that Gaddis had threatened the officers with a knife is not the only reasonable inference from the officers’ body language depicted on the videotape. Cf. Headwaters Forest Def. v. County of Humboldt, 211 F.3d 1121, 1132 n. 5 (9th Cir.2000) (“The videotape evidence here appears to raise more questions than it answers, which in the context of a motion for judgment as a matter of law must be resolved in favor of the plaintiffs as the nonmoving parties.”), vacated on other grounds, 534 U.S. 801, 122 S.Ct. 24, 151 L.Ed.2d 1 (2002).
III.
Even assuming, arguendo, that Gaddis had been wielding a knife, there is a genuine issue of material fact as to the reasonableness of the officers’ use of force. Gad-dis’ expert witness on law enforcement matters, Dr. James Fyfe, points out several deviations from accepted police practice that resulted in the officers’ unnecessary escalation of the confrontation with Gad-dis. For example, Bain testified that he blasted Gaddis with pepper spray because he was concerned that Gaddis would try to get in his car and drive away. The videotape, however, does not evidence any “body language” on Gaddis’ part that is consistent with a desire to leave the scene. Moreover, as Dr. Fyfe notes, the tactically more appropriate decision would have been to position the police vehicles around Gaddis’ car so that it would have been impossible for him to escape. Officer Champoux testified that he could have blocked Gaddis’ car with his patrol car if Gaddis had tried to leave.
The pepper spray blast was only the prelude to the most egregious examples of *785 improper police tactics. According to Dr. Fyfe, the confrontation with Gaddis “unfolded as a series of surprises” because “nobody was in charge, there was no central plan, and there was no attempt to assure that officers knew what each other was doing and what it was expected to accomplish.” (J.A. 745.) Most notably, without any warning to his colleagues, Officer Burdick scrambled over the back of Gaddis’ ear in an attempt to ambush Gad-dis. Dr. Fyfe points out that officers are instructed to keep their distance from people who are armed with knives, unless there is absolutely no way to protect an individual from an imminent threat to life. It is clear that, prior to Burdick engaging in his ill-advised tactic, no one’s life was in danger. As the tape shows, Gaddis became aware of Burdick’s presence on his car and reacted predictably by swinging his hand at Burdick, allegedly stabbing Burdick with a knife. Thus, Burdick unreasonably created a foreseeable circumstance in which the other officers were forced to take action to protect him from Gaddis.
According to Defendants, the officers had no choice but to open fire on Gaddis. Burdick’s testimony and the videotape, however, strongly indicate that the officers shot Gaddis after he no longer posed a danger to Burdick. Burdick testified that he was on the ground at the back of Gad-dis’ car at the time the other officers began shooting Gaddis. Based on this evidence, Dr. Fyfe opines that Burdick was well out of Gaddis’ range at the time Gad-dis was being shot, and, therefore, Gaddis presented no danger to Burdick or anybody else at that time. Indeed, it would have been extremely reckless for the officers to have shot at Gaddis while Burdick was near Gaddis. Accordingly, even assuming that Gaddis had been wielding a knife and that it was reasonable for Bur-dick to jump him from behind, there is a genuine issue of material fact as to whether it was reasonable for Officers Bain and Duffany to have shot at Gaddis 16 times.
IV.
It appears that at every turn my colleagues have taken great pains to construe each factual dispute as immaterial and/or draw inferences from the evidence that favor only Defendants. This approach is inconsistent with both the letter and the spirit of Rule 56. It is disputed whether Bain had probable cause, or even reasonable suspicion, to stop Gaddis for careless driving or drunk driving, since all that is undisputed is that Gaddis’ car gradually veered and touched the painted hashes on the road on two occasions. It is disputed whether Officers Bain and Duffany acted reasonably in firing 16 gun shots at Gaddis because it cannot be concluded as a matter of law that Gaddis had been brandishing a knife or any other dangerous object. The officers’ testimony is inconsistent as to the presence and size of the purported knife; there remain serious questions about the authenticity of the knife the officers’ attribute to Gaddis; the officers failed to preserve any physical evidence that would have proven that Gaddis had wounded Officer Burdick with the knife; and the videotape is consistent with the inference that Gaddis had not wielded a knife. Moreover, even assuming that Gaddis had been holding a knife, the purported need to shoot him was precipitated by Officer Bur-dick’s bumbling attempt to subdue him. And although the officers justified their shooting as necessary to protect Burdick, the evidence strongly indicates that Bur-dick was out of harm’s way at the time the shooting had begun. From these facts, it reasonably could be inferred that the officers who fired at Gaddis did not intend to protect Burdick, but to kill Gaddis. The responsible thing to do would be to reverse *786 the district court’s grant of summary judgment.

. Champoux is no longer a police officer. He resigned allegedly for personal reasons after pleading guilty to impaired driving.

. It is unclear whether the shirt bears any evidence of having been pierced or cut. The parties have not discussed the issue.

. At deposition, Burdick testified that he had been trained to preserve evidence of blood-soiled clothing.