**UNITED STATES of America, Plaintiff–Appellee, No. 98–3211**

v.

**Tyransee A. HARRIS, Defendant–Appellant.**

No. 98–3211.

United States Court of Appeals, Sixth Circuit.

Argued June 11, 1999.

Decided Sept. 21, 1999.

Robert J. Becker (argued and briefed), Office of the U.S. Attorney, Arkon, OH, for Plaintiff–Appellee.

Edward G. Bryan (argued and briefed), Federal Public Defender's Office, Cleveland, OH, for Defendant–Appellant.

Before: KEITH, DAUGHTREY, and MOORE, Circuit Judges.

## OPINION

KEITH, Circuit Judge.

Defendant–Appellant Tyransee Harris appeals his conviction and sentence for possession of cocaine with intent to distribute and for being a felon in possession of a firearm. On appeal, Harris argues that: (1) the district court improperly denied his motion to suppress the physical evidence found on his person; (2) the district court erred in denying his *Batson* challenge during jury selection; (3) the district court erred in allowing a police officer to offer expert testimony at trial; and (4) there was insufficient evidence presented at trial to allow the jury to find that Harris intended to distribute the crack cocaine in his possession. For the reasons set forth below, we affirm the district court's decision in all respects save the *Batson* issue. Because we find that the district court engaged in an improper analysis in concluding that the government did not purposefully discriminate during jury selection, we remand the case to the district court for a proper determination.

## I. Background

On August 6, 1997, Tyransee Harris was charged in a two count indictment in the United States District Court for the Northern District of Ohio. Count One charged him with knowingly possessing with intent to distribute approximately 5.9 grams of crack cocaine in violation of 21 U.S.C. § 841(a)(1). Count Two charged him with knowingly possessing a firearm after having been convicted of a crime punishable by imprisonment for a term exceeding one year in violation of 18 U.S.S. § 922(g)(1). Following a two day jury trial, Harris was found guilty on both counts and sentenced to 137 months imprisonment on Count One and 120 months imprisonment on Count Two, with the sentences to run concurrently and to be followed by eight years of supervised release.

## II. Facts

On September 1, 1996, Officer Brett Snavely of the Mansfield, Ohio Police Department was working the 2–10 p.m. shift in his assigned neighborhood. In response to citizen complaints about drug trafficking

in the area and a purported crack house at 133 Arthur Avenue, Officer Snavely set up surveillance on Arthur Avenue in his marked police cruiser just after dark. At approximately 8:30 p.m., Officer Snavely observed Harris walking back and forth along Arthur Avenue. Snavely testified that Harris seemed to be walking erratically, causing Snavely to suspect that he might be under the influence of alcohol. Snavely also testified that, at one point, Harris bent down and appeared to remove something from his shoe or sock, and then walked along appearing to cup something in his hand. Snavely also stated that Harris had one pant leg rolled up, and that this is a common street sign that a person is holding or dealing drugs. On the basis of these observations, Officer Snavely decided to stop Harris and called for backup. Snavely then pulled his police cruiser out of the shadows and approached Harris. When Harris saw the police car approach, he walked up onto the front porch of 104 Arthur Avenue. Officer Snavely exited his vehicle and approached Harris. As Snavely walked around his car, Harris came part of the way down the steps towards him. Snavely asked Harris what he was doing, and Harris responded that he was there to see his cousin. When Snavely asked for the name of the cousin, Harris responded, "My name is Tyransee Harris." Snavely repeated that he wanted the name of Harris's cousin, but Harris did not respond. Snavely observed no evidence of any alcohol-induced impairment. Officer Snavely testified that during this exchange, Harris's hands were up against the front of his body, which made him uneasy because he feared Harris might have a weapon. When Officer Snavely asked Harris to move his hands away from his body Harris refused, further increasing Snavely's anxiety. He told Harris that he was going to pat him down for weapons, and Harris responded that he would not allow him to do so. Officer Snavely then grabbed Harris and a physical struggle ensued until the backup unit arrived. After Harris was handcuffed, he indicated toward the front

of his pants and said, "It's right here." The officers discovered an unloaded .25 caliber pistol in a holster in the front of his pants. Harris also directed the officers to his right front pocket where they found two small plastic bags containing crack cocaine. The first bag contained approximately twenty individually wrapped pieces of crack cocaine totaling 3.056 grams. The second bag contained one large rock with one small piece broken off totaling 2.8 grams.

At jury selection, the government used two peremptory challenges to strike two African–Americans from the venire panel. Defense counsel objected to the strikes on the basis of *Batson v. Kentucky*, arguing that the prosecution could not exercise its peremptory challenges to purposely strike a person from the venire because of his race. The trial court, in denying Harris's *Batson* challenge, noted that one African–American had been seated on the jury, and that the two venire members who had allegedly been struck on the basis of their race would only have been alternate jurors even if they had been retained.

At trial, Officer Snavely testified as to his general experience in law enforcement and specifically as to his extensive background in narcotics investigations. He also testified, over defense objection, as to the methods of packaging and distributing crack cocaine and other methods and operations of street level drug dealers. His testimony included, *inter alia*, the supposition that a rolled up pant leg often serves as a signal that a person has drugs for sale, that shoes and socks are common places to hide drugs, and that large pieces of crack are often broken into smaller pieces and wrapped individually for sale.

### III. Analysis

1. *Terry Stop*

█ In his first assignment of error, Harris argues that the district court erred in denying his motion to suppress the physical evidence found on his person. He

claims that the search and seizure executed by Officer Snavely were violative of his Fourth Amendment rights and that the fruits of the search should therefore have been suppressed. This court reviews the district court's findings of fact for clear error and its conclusions of law de novo. The ultimate decision by the district court as to whether the facts of the case establish a Fourth Amendment violation is reviewed de novo. *See, e.g., United States v. Avery,* 137 F.3d 343, 348 (6th Cir.1997) (" '[A]s a general matter, determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal.' ") (quoting *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)).

■ In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that a police officer may stop an individual, question him, and perform a carefully limited pat down search for weapons where the officer reasonably concludes that criminal activity may be afoot. *Id.* at 30, 88 S.Ct. 1868. Because of the intrusive nature of such a search, the police officer must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. 1868. The officer must be able to articulate something more than an "inchoate and unparticularized suspicion or hunch.' " *Id.* at 27, 88 S.Ct. 1868. Harris argues that the district court erred in finding that Officer Snavely did in fact have the requisite reasonable, articulable suspicion to allow him to execute a *Terry* stop.

■ Harris's primary argument with respect to the search and seizure issue is that all of his actions were innocent in themselves and were insufficient to give rise to a reasonable inference of criminal activity. Officer Snavely observed Harris walking erratically back and forth in a high crime area on a street where there had been reports of drug dealing and he was in the vicinity of a reported crack house. He allegedly had one of his pant legs rolled up, which indicated from Officer Snavely's experience that Harris may have had drugs for sale. Harris was seen to stoop and remove something from his shoe or sock and walk along cupping his hands as though he were counting something.

Harris presents several plausibly innocent explanations for the conduct observed by Officer Snavely. It is certainly conceivable that Harris's walking back and forth on Arthur Avenue, his removal of an item from his shoe or sock, and his non-responsive answers to Officer Snavely's questions could have had entirely unsinister motives. But when viewed in the aggregate, we agree with the district court that Officer Snavely reasonably concluded that criminal activity may have been afoot. The Supreme Court addressed this issue in *United States v. Sokolow,* 490 U.S. 1, 9, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1 (1989), where it held that a series of acts, each of which is consistent with innocent behavior, may when taken together, amount to reasonable suspicion. We find that the instant case presents just such a scenario. As the Supreme Court noted in *Sokolow,* "Indeed, *Terry* itself involved 'a series of acts, each of them perhaps innocent' if viewed separately, 'but which taken together warranted further investigation.' " *Id.* at 9, 109 S.Ct. at 1586 (quoting *Terry,* 392 U.S. at 22, 88 S.Ct. at 1881).

In support of his claim that Officer Snavely lacked the reasonable suspicion necessary for an investigatory stop, Harris cites *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). In *Brown,* two police officers were patrolling a neighborhood during daylight hours when they observed the defendant walking away from another man in an alley in an area with a high incidence of drug traffic. *Id.* at 48, 99 S.Ct. at 2639. The officers testified that they stopped the defendant because they had never seen the defendant in that area before, and that the situation "looked suspicious." *Id.* at 49, 99 S.Ct. at 2640. The officers approached the defendant and

asked him to identify himself. *Id.* The defendant refused to do so, and the officers arrested him for violating a Texas statute which made it a criminal act for a person to refuse to give his name to a police officer who has lawfully stopped him. *Id.* The Supreme Court reversed the defendant's conviction for violating the statute because it found that the officers lacked any reasonable suspicion to believe that the defendant was engaged in or had engaged in criminal conduct, and therefore the officers' seizure of the defendant violated the Fourth Amendment. *Id.* at 52, 99 S.Ct. at 2641.

*Brown* is easily distinguishable from the case before us. In *Brown*, the officers were unable to point to *any facts* supporting their conclusion that the situation in the alley "looked suspicious." *Brown* presents us with a classic example of the "unparticularized suspicion or hunch" warned against in *Terry*. *Brown* presents a stark contrast to the instant case, where Officer Snavely testified that his suspicions were aroused by Harris's actions and mannerisms, as well as the mysterious items Harris removed from his shoe or sock which he appeared to be counting as he walked along.

The question of what constitutes reasonable suspicion is heavily dependent on the facts of each case and does not lend itself to precise categorizations within the case law. In addition to *Brown*, there are numerous cases in which courts have found a lack of reasonable suspicion based on the apparent lack of criminal activity afoot. In *United States v. Sprinkle*, 106 F.3d 613, 617–19 (4th Cir.1997), the Fourth Circuit held that police officers' knowledge of prior criminal activity of one of the occupants of a vehicle, the suspects' presence in a high crime area, one of the suspects hiding his face, and the suspects driving away quickly were not enough to amount to a reasonable suspicion of criminal activity. Likewise, in *United States v. Rodriguez*, 976 F.2d 592, 594–96 (9th Cir.1992), the Ninth Circuit held that the defendants'

presence on a notorious smuggling route, driving a certain type of car that appeared to have a heavy load, and being Hispanic were not enough to create reasonable suspicion in the minds of federal customs agents. We contrast these with cases such as *United States v. Lender*, 985 F.2d 151, 154–55 (4th Cir.1993), where the Fourth Circuit found reasonable suspicion where police officers saw a group of men huddling around the defendant and looking down into his palm while in a high crime area late at night. We also look to the D.C. Circuit's finding of reasonable suspicion in *United States v. Garrett*, 959 F.2d 1005, 1007 (D.C.Cir.1992), where a police officer observed a car with the same color and license plates reported in a citizen complaint in a high crime area, and saw an individual standing outside the car hand money to a person inside the car in exchange for a small object.

We find the circumstances of this case more analogous to *Lender* and *Rodriguez* because in each of those cases, as in the case before us, the officers observed an individual in possession of an object which a police officer, rationally drawing upon inferences from the facts and circumstances before him, could reasonably have believed to be illegal drugs.

■ Harris also argues that Officer Snavely went beyond the permissible bounds of the investigatory stop because Snavely stopped him, in part, because he believed Harris might be intoxicated. "[T]he scope of activities permitted during an investigative stop is determined by the circumstances that initially justified the stop." *United States v. Obasa*, 15 F.3d 603, 607 (6th Cir.1994). Harris claims that Snavely should have released him when he realized that Harris exhibited no signs of intoxication. This claim is unpersuasive in light of the facts before us. It is apparent that Officer Snavely did not stop Harris solely on the basis of his suspicion that Harris may have been intoxicated. Rather, Snavely continued to observe Harris perform a series of acts which led him to

believe that Harris might be involved in illegal drug activity, and only then did he stop him. Because Snavely's reasonable suspicion of criminal activity included the suspicion of drug activity as well as the suspicion of public intoxication, we find no constitutional violation where Snavely's investigatory stop included an investigation for drugs.

### 2. *Batson Challenge*

■■■ In his next assignment of error, Harris claims that the district court erred in denying his *Batson* challenge. Harris argues that the prosecutor purposefully excluded African–Americans from the jury in his trial in violation of his rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. It is well settled that a state denies a defendant equal protection of the laws when he is tried before a jury from which members of his race have been purposefully excluded. *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1880). In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court extended this principle to the use of peremptory strikes from the petit jury and articulated a process to challenge the allegedly discriminatory use of peremptory challenges. First, the defendant must make a prima facie showing of discriminatory use of peremptory challenges. A defendant establishes a prima facie case of purposeful discrimination by showing:

> That he is a member of a cognizable racial group ... that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race ... [and] that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the venire men from the petit jury on account of their race.

*United States v. Hill*, 146 F.3d 337, 340 (quoting *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723). Once the defendant has made a prima facie showing, the government must offer a race-neutral explanation for challenging the jurors. This is an extremely light burden, as the Supreme Court held in *Purkett v. Elem*, 514 U.S. 765, 767–68, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995), that the government's proffered reason need not be particularly persuasive, or even plausible, so long as it is neutral. Finally, the district court must determine whether the defendant has established purposeful discrimination. *Batson*, 476 U.S. at 96–98, 106 S.Ct. 1712. Because this determination turns largely on the evaluation of credibility, reviewing courts give the findings of the district court great deference. *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724.

The record in the instant case reveals that there was one African–American on the jury which convicted Harris. This juror was Number 25 on the venire panel and was the first African–American available on the venire panel. As it turns out, this venireman was the final panel member seated on the petit jury and was designated Juror Number 12. After the selection of the twelve petit jurors, the juror selection process continued so that the alternate jurors could be selected, and it is during this process that Harris claims the discrimination occurred.

■■■ Venire panelists Numbers 26 and 27, who would have been alternate jurors Numbers 1 and 2, were both struck by the prosecutor. The prosecutor claimed that he eliminated venire member No. 26, an African–American woman, because she was unmarried and had no children. He further claimed that her demeanor seemed to indicate she did not want to be there. Venire member No. 27, an African–American male, was also struck by the prosecutor, allegedly because he had no children and had been a bus driver with the local transit authority. The prosecutor explained that there had recently been problems between local law enforcement officials and transit authority drivers, and he feared that Venire member No. 27

may have harbored feelings of animosity towards law enforcement officials.

When the prosecutor struck the two African–American venire panelists, defense counsel objected under *Batson*. Before the district court ruled as to whether Harris had established a prima facie case, the prosecutor offered his race-neutral reason for his use of the strikes. The district court then made a finding that the prosecutor had not engaged in intentional discrimination. This sequence of events renders the initial question of whether defendant established a prima facie case moot. *See Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."). Continuing with the second step of the *Batson* analysis, we see that the prosecutor, in his explanation of why he had struck Venire members No. 26 and 27, clearly carried his light burden.

 It is the district court's execution of the third step of the *Batson* analysis which we must examine closely. The district court, in its determination that the prosecutor had not engaged in unlawful discrimination, noted:

All right. The court notes that the first African–American panel member was No. 25, and No. 25 is, in fact, seated on the jury as No. 12. The next two African–Americans struck by the government actually would have been alternates if they had not been struck as

jurors. So under the circumstances, the court will deny the *Batson* challenges. (Tr. at 67)

This finding by the district court is insufficient or mistaken in at least two respects. First, it is evident that the district court gave great weight to the fact that one African–American was in fact seated on the jury. We note that the presence of one African–American on the jury does not preclude a *Batson* challenge. *Jones v. Ryan*, 987 F.2d 960, 971 (3d Cir.1993) ("Although one black person was ultimately empaneled, 'the mere presence of a single black on the jury would not necessarily prevent a finding of a prima facie case.' ") (internal citations omitted); *United States v. Battle*, 836 F.2d 1084, 1086 (8th Cir. 1987) ("[T]he striking of a single black juror for racial reasons violates the equal protection clause, even though other black jurors are seated, and even when there are valid reasons for the striking of some black jurors."). Thus, the district court's notation that one African–American juror was seated does not, standing alone, warrant the conclusion that the defendant has failed to meet his burden.[1] The only other factor mentioned by the district court was its observation that the two venire panelists who were struck would only have served as alternates even if they had not been struck by the prosecutor. The logic of this statement escapes us as it is clear that the district court, at the time it made its ruling, could not possibly have known whether any of the alternates would be called to serve on the petit jury. Moreover, the harm inherent in a discriminatorily chosen jury inures not only to the defendant, but also to the jurors not selected because of their race, and to the

---

1. Our decision in *United States v. Tucker*, 90 F.3d 1135, 1142 (6th Cir.1996), is not to the contrary. In *Tucker*, we noted (as one of three factors) the fact that the prosecution had "waived a number of peremptory challenges, leaving open the possibility that an African–American might be on the jury," citing prior Sixth Circuit law. *See United States v. Sangineto–Miranda*, 859 F.2d 1501, 1522 (6th Cir.1988). In *Tucker*, we also noted that

the defendant did not offer any evidence or argument to respond to the prosecution's articulated reason, and the prosecution's explanation was not inherently suspect. Both *Tucker* and *Sangineto–Miranda* discuss a number of relevant factors, and neither offers support for the conclusion that the failure to exclude one member of a protected class is sufficient to insulate the unlawful exclusion of others.

integrity of the judicial system as a whole. *See Batson*, 476 U.S. at 87–88, 106 S.Ct. 1712. This principle is equally applicable to the selection of alternate jurors. Thus, we hold this factor of alternate status to be irrelevant, leaving the selection of one African-American for the jury as the only articulated reason for the district judge's conclusion denying the *Batson* challenge.

▉ The government, having the benefit of hindsight, argues that any error made by the district court in this respect must be deemed harmless, as none of the alternate jurors were ever called upon to deliberate in this case. The government's position is without support.

This type of error involves a "structural error," which is not subject to harmless error analysis. *See Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In *Fulminante*, the Supreme Court distinguished between "trial errors" which are subject to harmless error review and "structural errors" which are not. Trial errors, according to the Supreme Court, are errors which occurred during the presentation of the case to the jury, while structural errors affect the "entire conduct of the trial from beginning to end." *Id.* at 309, 111 S.Ct. at 1265. A panel of this court applied this principle in *United States v. McFerron*, 163 F.3d 952, 956 (6th Cir.1998), where it held that the erroneous denial of a peremptory challenge constituted "structural error" under the *Fulminante* analysis. And while the instant case involves the allegedly erroneous grant of a peremptory challenge rather than the erroneous denial of a peremptory challenge, we make no distinction between the two cases, as the underlying rationale is the same. Because the process of jury selection—even the selection of alternate jurors—is one that affects the entire conduct of the trial, the district court's decision with respect to the peremptory challenges of the alternate jurors is not subject to harmless error review.

In sum, the district court's terse analysis of the *Batson* challenge leaves us with little to review. It seems to have made no effort to weigh the credibility of the prosecutor's asserted reasons for striking the panelists, relying instead on impermissible factors in reaching its conclusion. We therefore remand this issue to the district court for a proper determination.

3. *Admission of Officer Snavely's Expert Testimony*

▉ Harris next contends that the district court erred in admitting Officer Snavely's expert opinion testimony as to the methods and operations of street level drug dealers. The question of admissibility of expert testimony is reviewed for an abuse of discretion. *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

Harris argues that the amount of crack cocaine found on his person (approximately 5.9 grams) was for his own personal consumption, and that the government should not have been permitted to introduce that portion of Officer Snavely's testimony which described the methods and operations of street level drug dealers. Harris claims that the district court did not properly determine the reliability of Officer Snavely's expert opinion testimony and that the testimony should therefore not have been admitted.

In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993), the Supreme Court held that Federal Rule of Evidence 702 placed a special obligation upon the trial court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." And although *Daubert* was restricted by its facts to scientific testimony, this Circuit has broadly applied *Daubert's* relevance and reliability analysis to all evidence offered under Rule 702. *See, e.g., United States v. Jones*, 107 F.3d 1147, 1156 (6th Cir.), *cert. denied*, 521 U.S. 1127, 117 S.Ct. 2527, 138 L.Ed.2d 1027 (1997); *United States v.*

*Thomas,* 74 F.3d 676, 681 (6th Cir.), *cert. denied,* 517 U.S. 1162, 116 S.Ct. 1558, 134 L.Ed.2d 659 (1996); *Berry v. City of Detroit,* 25 F.3d 1342, 1350 (6th Cir.1994), *cert. denied,* 513 U.S. 1111, 115 S.Ct. 902, 130 L.Ed.2d 786 (1995). Moreover, the Supreme Court, in *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999), recently broadened the *Daubert* analysis to specifically include "technical" as well as "other specialized knowledge," such as that possessed by Officer Snavely.

 We find this case analogous to *Thomas,* where a police detective was permitted to testify as both a fact and an expert witness. In response to Thomas's argument that the detective's testimony about the usual methods and operations of drug traffickers was unnecessary, a panel of this court wrote, "Courts have overwhelmingly found police officers' expert testimony admissible where it will aid the jury's understanding of an area, such as drug dealing, not within the experience of the average juror." *Id.* at 682. We find that the district court did not abuse its discretion in allowing Officer Snavely's expert opinion testimony about the significance of Harris's observed behavior.

### 4. *Sufficiency of the Evidence*

In his final assignment of error, Harris contends that the evidence presented at trial was insufficient to support a conviction for possession with intent to distribute crack cocaine. In determining whether evidence presented at trial was sufficient to support a conviction for the crime charged, an appellate court looks to see "whether, after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

 Harris concedes that the proof presented at trial was sufficient to show

that he knowingly possessed crack cocaine, but he disputes whether the evidence was sufficient to prove that he had the intent to distribute it. He argues that the relatively small amount (approximately 5.9 grams) of crack found in his possession could easily have been for his personal consumption rather than for distribution. The relatively small amount of cocaine in his possession, however, is offset by several factors. First, it is undisputed that Harris was carrying two small bags containing cocaine, one of which held twenty small, individually wrapped pieces of crack. Second, the jury also heard evidence that Harris was apprehended while walking aimlessly back and forth in an area known for drug distribution, allegedly with one pant leg rolled up, while carrying a pistol. And while we are mindful of the possibilities that the crack could have been packaged that way when Harris bought it and that he could have just been going for a walk or "killing time" when he was apprehended, we are convinced that a rational jury could have reasonably found that Harris intended to distribute the crack cocaine in his possession. Consequently, Defendant's challenge to the sufficiency of the evidence fails.

### IV. Conclusion

For the foregoing reasons, we **AFFIRM** the district court in every respect except the *Batson* analysis. We **REMAND** the case to the district court for a proper determination of whether the government engaged in purposeful discrimination by striking two African–Americans from the venire panel.