NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0051n.06
Filed: January 23, 2009

No. 06-6524

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| BENNY NEELEY, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE: GIBBONS and WHITE, Circuit Judges, and TARNOW,\* District Judge.**

**WHITE, CIRCUIT JUDGE.** Appellant Benny Neeley appeals his convictions of engaging in a continuing criminal enterprise and conspiring to engage in a financial transaction with criminally derived property. Neeley contends that the district court erred when it (1) allowed two federal agents to offer opinion testimony, (2) provided instructions to the jury that referred to both agents as experts, and (3) failed to give the jury a cautionary instruction regarding the dual role (providing fact and expert testimony) of one of the agents. Neeley also contends that the government failed to turn over evidence that the defense could have used to impeach a prosecution witness. We **AFFIRM** the district court.

---

\*The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

I.

The United States charged Neeley with knowingly and intentionally engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848, and conspiring to engage in a financial transaction with criminally derived property exceeding $10,000 in violation of 18 U.S.C. § 1956(h). At trial, the government presented the testimony of Special Agent Jerel Hughes of the Drug Enforcement Administration (DEA) and Special Agent Walter Woosley of the Internal Revenue Service Criminal Investigation Division (IRS-CID). Both gave a combination of opinion and fact testimony, although neither was formally qualified by the court as an expert. The jury found Neeley guilty on both counts, and the district court sentenced him to terms of 380 months' and 240 months' imprisonment to be served concurrently.

**A.      Testimony of Agent Hughes**

Agent Hughes testified that he had been an agent with the DEA for the last six and a half years, and that prior to working with the DEA, he was a border patrol agent with the Immigration and Naturalization Service (INS). While a border patrol agent, Hughes received training in the identification of controlled substances, immigration law, criminal law, and Title 21. He was stationed in Laredo, Texas, a town on the Mexican border, and on "a daily basis" investigated cases involving marijuana. Hughes had "extensive training and experience" regarding the transportation of controlled substances.

In October 2003, a DEA intelligence analyst noticed that several individuals in Laurel County, Kentucky were transferring large amounts of money through wire transfers with Western

Union to Brownsville, Texas, a border town on the Gulf of Mexico. Hughes began an investigation

by reviewing Western Union records. He testified:

> Just by looking at these records and by what I know about the local community,
> it was obvious to me that this was a drug organization. It's just blatantly obvious
> to me from my experience as a DEA agent. But I needed someone who could,
> like, put the pieces together for me, and I recognized the name of Mr. Theard
> Parsons on there. I'd had contact with him in the past. So I contacted him and
> requested that he come to my office to shed a little light on what these records
> meant.

With Parsons' help, Hughes identified and interviewed a number of persons he suspected were

involved in trafficking marijuana from Mexico to Kentucky. Many of the individuals Hughes

interviewed lived in the same area — on or around Rooks Road in Laurel County, near the residence

of Benny Neeley.

Through his interviews with various individuals who had wired money to Texas, Hughes

learned that the money was wired at Neeley's request. Hughes testified:

> [T]he way this organization was structured and the way it worked, from talking to
> — or from my investigation, is that Mr. Neeley gave the people who were wiring
> money to get dope for him the names and address of the people to send the money
> to, he would either write it down or in some instances he would fill out the Western
> Union paperwork for them, send them the money, send them or take them to the
> Western Union to send it.

In return for wiring money, "everyone that sent the money for Mr. Neeley was paid, I believe, $100

every time they wired the money."

On January 20, 2004, Hughes, accompanied by other law enforcement officials, executed a search warrant at Neeley's residence. The officers found Neeley at home and recovered $3,000 in cash from the premises.[1] No marijuana was recovered.

At trial, Hughes provided opinion testimony regarding the price (from $600 to $1000) and quality of a pound of Mexican marijuana sold in Kentucky, common methods of transporting marijuana from Mexico to Kentucky, and common methods of transferring money from Kentucky to Mexico. Finally, Hughes was asked if it is "common for people who are sending money Western Union, receiving packages back to the U.S., to keep the drugs in their residence?" Hughes responded: "Some would, but the mastermind behind this, the controller, wouldn't, no." The government then asked: "And likewise, in these types of cases that you're talking about with these drug amounts, is it common for you to find these large amounts of money in somebody's residence?" Hughes replied: "Yes."

### B.    Testimony of Agent Woosley

Agent Woosley testified that he had been an agent with the IRS-CID for the last eighteen and a half years. At IRS-CID, Woosley investigated "violations of income tax law and other money laundering violations." Woosley has a bachelor's degree in business administration, and has taken "numerous training courses in financial crime dealing with money laundering, asset forfeiture, how to look at business books and records to determine what's legitimate and what's illegitimate." In

---

[1]Western Union receipts and a piece of paper containing the names of individuals who received wire transfers in Texas were also recovered from the search. Hughes did not offer testimony regarding the recovery of this evidence.

addition, Woosley has "taught money laundering to bank examiners. . . .[and] other students." He has "also been part of task forces that have redesigned [the government's] money laundering. . . helped to rewrite training courses for that. . ." Finally, Woosley stated that he has training in narcotics law, and has worked extensively with the DEA and FBI, and that "since 1990, I've been involved with narcotics traffickers that have dealt with cocaine, crack, small amounts of heroin, methamphetamine, marijuana, pretty much just about anything you can determine.. ."

At trial, Woosley testified that he reviewed Western Union records of wire transfers from Kentucky to Texas, and made a chart summarizing the information. This chart was published to the jury and admitted into evidence. The chart had columns titled payer, payee, date, amount wired, total wired, and wire fee. It included the names of individuals the government suspected were related to Neeley's trafficking operation, listing the dates they wired money to Brownsville, the name and address they sent the money to, and the total amount the individual wired. Woosley testified regarding the chart at trial, explaining who the individuals listed were and what connections they had to Neeley. Altogether, Woosley testified that he had documentation of wire transfers by individuals in Kentucky in furtherance of Neeley's drug trafficking operation totaling $334,990.

Like Hughes, Woosley also offered opinion testimony, and stated that using Hughes' estimation regarding the price of marijuana sold in Kentucky, he calculated that the $334,990 wire transferred to Texas represented at least 410 pounds of marijuana. Woosley also defined the terms "money laundering," "illegal activity," "asset forfeiture," "cash transaction report," "financial institution," "financial transaction," and "interstate." Woosley explained that financial institutions, such as Western Union, are required to fill out a cash transaction report, or CTR, for transactions

over $10,000. He explained that "it's quite common that individuals engaged in an illegal business, such as narcotics trafficking, understand the requirements of the $10,000 ceiling. . . . What they can do is. . . break that down into 3-, 4-, 5-, 6-, 7,000, 8,000 . . . . so that they attempt to circumvent the system."

### C.       Other Witness Testimony

In addition to Hughes and Woosley, the government presented the testimony of three other law enforcement witnesses. Frank Antos, special agent with the U.S. Forest Service assigned to the Appalachia High Intensity Drug Trafficking Area Task Force, testified that he was present at the search and made a videotape of the residence. He recovered a piece of paper "torn out of a spiral notebook" that contained the names "Ana B., Monica Gonzales, Elsa," and "recognize[d] those names as being the names of individuals in Brownsville, Texas, that were . . . tied to . . .the wire transfer."

Jason O'Bannon, a detective with the Kentucky State Police, testified that he was present during the search and that Neeley told him "that he had received, in his words, dope from Brownsville, Texas. And during the conversation, it was — to me, he wanted to distance himself by saying it was in the past and that he had — the last time he had received those was when he lived in Indiana."

Thomas MacKnight, a Kentucky police officer also present at the search, testified regarding items recovered during the search. Among the documents recovered were several Western Union receipts, including a receipt of a transfer by Angela Rains to Jose Blanco.

Seven witnesses testified that they wired money to Texas at Neeley's request. Angela Rains, Victor Tuttle, Theard Parsons, Virginia Parsons, Woodrow Jones, Melvin Jerome Wilson, and Lula Gregory each testified that he or she sent money received from Neeley to addresses in Brownsville on multiple occasions. They each stated that they received $100 as payment for sending the money.

Virginia Parsons also testified she and her husband, Theard, received packages that contained marijuana for Neeley, and turned the packages over to him. In return, they were offered payment of either $900 or a pound of marijuana. Virginia was present when one of the packages was opened, and saw that it contained marijuana wrapped in cellophane.

Melvin Jerome Wilson received two UPS packages for Neeley containing marijuana. The first package contained twenty-three pounds of marijuana stored inside a speaker frame. As compensation, Wilson was permitted to keep one pound of marijuana.

### D.    Jury Instructions

The district court's instructions to the jury included the following:

> Another part of your job as jurors is to decide how credible or believable each witness was. Again, that is your job and not mine. It is up to you to decide if a witness's testimony was believable and how much weight you think it deserves. You are free to believe everything that a witness said or only part of it or none at all, but you should act reasonably and carefully in making these decisions.
>
> Now, let me suggest some things for you to consider in evaluating each witness's testimony.
> . . .
>
> Ask yourself if the witness had any relationship to the government or the defendant or anything to gain or lose from the case that might influence the witness's testimony.

> Ask yourself if the witness had any bias or prejudice or reason for testifying that might cause the witness to lie or slant the testimony in favor of one side or another.

And, at a later point:

> You've heard the testimony of Agent Jerel Hughes and Agent Walter Woosley. An expert witness has special knowledge or experience that allows the witness to give an opinion. You do not have to accept an expert's opinion. In deciding how much weight to give it, you should consider the witness's qualifications and how he reached his conclusions. Remember that you alone decide how much of a witness's testimony to believe and how much weight you think it deserves.

## II.

Neeley argues that the district court erred in failing to perform its "gatekeeper" function under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Company v. Carmichael*, 526 U.S. 137 (1999), when it permitted Agents Hughes and Woosley to give opinion testimony without making a formal finding on the record that they were qualified as experts under Federal Rule of Evidence 702.[2] Neeley did not object at trial to the qualifications of Agents Hughes and Woosley to offer expert testimony. This Court reviews issues involving the admissibility of expert testimony for plain error where no objection was made at trial. *United States v. Johnson*, 488 F.3d 690, 697 (6th Cir. 2007). Under this standard, Neeley must demonstrate (1) error (2) that was plain and (3) that affected his substantial rights and (4) seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Id.* "Whether the trial court

---

[2]Fed. R. Evid. 702 states that a person with "specialized knowledge" qualified by his or her "knowledge, skill, experience, training or education" may give opinion testimony if it "will assist the trier of fact to understand the evidence or to determine a fact in issue."

committed plain error always depends on the specific facts of the case at hand." *United States v. Martin*, 520 F.3d 656, 658 (6th Cir. 2008).

In *Daubert*, the Supreme Court held that Rule 702 placed a special obligation on the trial court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. Although *Daubert* was restricted by its facts to scientific testimony, this Court has broadly applied *Daubert*'s relevance and reliability analysis to all evidence offered under Rule 702, *United States v. Harris*, 192 F.3d 580, 588-89 (6th Cir. 1999), including law enforcement agents testifying as experts on drug trafficking, *United States v. Lopez-Medina,* 461 F.3d 724, 742 (6th Cir. 2006), and has consistently "found police officers' expert testimony admissible where it will aid the jury's understanding of an area, such as drug dealing, not within the experience of the average juror." *United States v. Thomas*, 74 F.3d 676, 682 (6th Cir. 1996).

This Court specifically addressed the issue of formally qualifying police officers as experts in *United States v. Johnson,* 488 F.3d 690, 697 (6th Cir. 2007). The *Johnson* court instructed trial courts to refrain from declaring before the jury that a law enforcement officer is considered an expert, and instead recommended that "the proponent of the witness should pose qualifying and foundational questions and proceed to elicit opinion testimony. If the opponent objects, the court should rule on the objection." *Id*. at 698.

Neeley acknowledges this holding in *Johnson* but argues that the district court had a duty to make a formal inquiry into the agents' qualifications in order to determine that they were qualified to give opinion testimony, and that this formal step could have been conducted outside of the jury's presence.

There is no authority to support Neeley's argument that a district court must, sua sponte, conduct a formal inquiry into the qualifications of a witness before allowing expert testimony. In *Lopez-Medina*, this Court found that the DEA agents possessed "obvious qualifications," and thus, "no abuse of discretion occurred in the district court's failure to qualify the witnesses formally before allowing their expert testimony." *Lopez-Medina*, 461 F.3d at 743.

Courts generally have permitted police officers to testify as experts regarding drug trafficking as long as the testimony is relevant and reliable. *Johnson*, 488 F.3d 698. The Sixth Circuit "regularly allows qualified law enforcement personnel to testify on characteristics of criminal activity, as long as appropriate cautionary instructions are given, since knowledge of such activity is generally beyond the average layman." *United States v. Swafford*, 385 F.3d 1026, 1030 (6th Cir. 2004).

Here, the government posed qualifying and foundational questions to Hughes and Woosley before eliciting their opinions. Hughes testified that he had been an agent with the DEA for the past six years, and prior to that, had worked as a border patrol agent with the INS. Hughes stated that as a border patrol agent, he received training in the identification of controlled substances and criminal law. Hughes was clearly qualified to offer opinion testimony regarding the price and quality of marijuana grown in Mexico, common methods used by drug traffickers to transport marijuana to northern destinations and to send cash payments back south, and whether the "mastermind" behind a drug operation would ordinarily have drugs or cash at his residence.

Agent Woosley had eighteen years experience with the IRS-CID, and had significant training in money laundering that qualified him to offer definitions of the terms "money laundering," "illegal activity," "asset forfeiture," "cash transaction report," "financial institution," "financial transaction,"

and "interstate." Woosley also agreed with Hughes' estimate regarding the price of a pound of Mexican marijuana. Finally, Woosley opined that a drug trafficker might choose to send money through a financial institution like Western Union in amounts under $10,000 per transaction to avoid detection by the government.

It is clear from the record that Hughes and Woosley were qualified to offer opinions on trafficking marijuana and money laundering, respectively. Neeley challenges the district court's failure to make an explicit finding that the agents were qualified to provide expert testimony, but there is no requirement that the court make such a record in the absence of an objection where the expert qualifications are apparent. *Lopez-Medina,* 461 F.3d at 743.

III.

In a related argument, Neeley contends that the court's expert witness instruction, which referred to Agents Hughes and Woosley as "expert witnesses," stating that they had "special knowledge or experience that allow[ed] them to give an opinion," was not supported by the record, because the court "failed to find that either Agent Hughes or Agent Woosley possessed sufficient qualifications to render an opinion or that the opinions offered during their testimony were based upon sound methodology." In challenging Hughes'[3] qualifications to provide expert testimony, Neeley argues that the government failed to demonstrate that Hughes had experience with Title 18, criminal procedure, or constitutional principles, and asserts "the record does not reflect that he has

---

[3]Neeley states that the record "fails to demonstrate that Agent Hughes had sufficient knowledge, training, and relevant experience to be qualified to render a Rule 702 opinion on drug trafficking." Neeley does not question Agent Woosley's qualifications in this section of his brief.

ever participated in a drug arrest or seizure, or that he has seen marijuana. Next we have no idea how many marijuana cases he has participated in investigating, or the basis for his opinions regarding Mexican and Kentucky marijuana."

However, Neeley failed to raise these objections at trial, and as discussed in the previous section, where an agent possesses obvious qualifications, as Agents Hughes and Woosley did, a district court does not err when it fails to formally qualify the witnesses before allowing opinion testimony. *Lopez-Medina*, 461 F.3d at 743. Further, because the record supports that the witnesses were qualified, we find no plain error in the court's expert witness instruction.[4]

IV.

Next, Neeley argues that the district court erred by allowing Agent Hughes to testify as both a fact and expert witness without giving the jury a cautionary instruction regarding his dual role. Indeed, this Court has held that "when a police officer testifies in two different capacities in the same case, there is a significant risk that the jury will be confused by the officer's dual role," and has warned that the district court and the government must "take care to assure that the jury is informed of the dual roles of a law enforcement officer as a fact witness and an expert witness, so that the jury can give proper weight to each type of testimony." *United States v. Thomas*, 74 F.3d 676, 682-83

---

[4] The instruction given was consistent with the Sixth Circuit Criminal Pattern Jury Instruction 7.03 at the time of Neeley's trial in 2006. On December 31, 2007, the 2005 Edition was updated, and the Committee Commentary to Rule 7.03 reveals that the instruction has recently "been amended in the wake of *United States v. Johnson*, 488 F.3d 690 (6th Cir. 2007) to avoid the term expert." The instruction given to Neeley's jury used the term "expert" rather than "opinion," as the Pattern Instructions at that time directed.

(6th Cir. 1996). This court has also observed that an additional precaution can ameliorate the risk of confusion; the prosecutor should delineate the transition between the examination of the officer as an expert witness and questions relating to his role as a fact witness. *Id*.; *United States v. Cobbs*, 233 Fed. Appx. 524, 540 (6th Cir. 2007). Here, Neeley observes, there was neither a delineation between Hughes' fact and opinion testimony, nor was a "dual role" instruction given.

In arguing for reversal, Neeley relies on *United States v. Lopez-Medina*, in which this Court found that the failure to instruct the jury on the dual role of an agent witness constituted plain error. We do not agree that *Lopez-Medina* requires reversal. 461 F.3d at 745. In *Lopez-Medina*, most of the evidence presented by the government was provided by DEA agents.[5] One agent was questioned as an expert about the significance of items he seized from defendant's residence, such as vacuum sealers that smelled of ether, packaging materials, and cryptic notations on scraps of paper. *Id*. at 744-45. Another agent offered an opinion that documents recovered from the residence were drug ledgers. *Id*. at 745. This court noted that the agents' testimony at trial lacked any clear demarcation between expert and fact witness testimony. In applying a plain error analysis to the failure to instruct regarding the dual roles, the *Lopez-Medina* court also considered other evidentiary errors that occurred at trial, primarily the improper admission of criminal records and mug shots of defendant's alleged co-conspirators. *Id.* This court concluded that "the [improper] introduction of . . .mug shots

---

[5]DEA Agent Mundy provided the bulk of the evidence against Medina. Three other DEA agents also provided testimony, as well as a prosecution witness who was a prisoner in the same facility as Medina and testified that Medina "said he was dealing cocaine." *Lopez-Medina*, 461 F.3d at 735.

and criminal history to the jury here compels that we vacate Medina's conviction" and that the "additional error" in the jury instructions "further buttresses our conclusion of prejudice." *Id*. at 749.

In contrast, while Hughes provided both fact and opinion testimony, his fact testimony was not a cornerstone of the government's case. Although Hughes was present at the search of Neeley's home, Agent Antos and Detective MacKnight testified regarding the evidence seized during the search. In addition, numerous non-police witnesses testified that they wired money to Texas for Neeley, and at least two of those witnesses also testified that they received packages containing large amounts of marijuana on Neeley's behalf, and turned the packages over to him. Unlike the largely circumstantial case in *Lopez-Medina*, here there is ample evidence from Neeley's associates explaining the operation of his drug trafficking enterprise. When the testimony of the individuals who wired money at Neeley's direction is combined with the extensive paper trail of Western Union records, the evidence implicating Neeley is overwhelming. Neeley cannot show that the jury's verdict would have been different had the jury been cautioned of the need to differentiate between fact and expert testimony. Thus, Neeley has not shown that he suffered substantial prejudice, or that a miscarriage of justice resulted. *See United States v. Martin*, 520 F.3d 656 (6th Cir. 2008); *United States v. Cobbs,* 233 Fed. Appx. 524 (6th Cir. 2007).

Further, in *Lopez-Medina,* this court noted that the jury was given no expert instruction at all in connection with the agents' testimony, but only the general instruction that "the testimony of government agents 'is not entitled to any greater weight.'" *Lopez-Medina*, 461 F.3d at 744. This court expressed concern that "this instruction. . . does not address the particular concerns that may arise when an officer gives expert opinion testimony. A general instruction on weighing officer

testimony does not guard against a jury mistakenly weighing opinion testimony as if the opinion were fact, nor does it instruct the jury that they are free to reject the opinions given." *Id.* In the instant case, however, the jury was given both a general instruction on witness credibility[6] as well as an expert witness instruction, which informed them that they did "not have to accept an expert's opinion."

## V.

Neeley also seeks reversal on the basis that the government committed a *Brady*[7] violation by failing to turn over evidence that the defense could have used to impeach a prosecution witness. As factual support for this claim, Neeley cites an August 18, 2007 plea agreement in the case of *United States of America v. Jason O'Bannon*, United States District Court, Eastern District of Kentucky, No. 5:07-cr-120. The government has filed a motion to strike Neeley's appeal brief on the ground that he improperly referred to the plea agreement, which was not in the record before this court. Neeley has responded to the motion to strike and has asked that this court take judicial notice of the plea. The government opposes Neeley's motion, and suggests that his "appropriate remedy is to collaterally attack his conviction in a 28 U.S.C. § 2255 proceeding before the district court where he may be entitled to discovery and a hearing."The government's motion to strike and Neeley's motion to take judicial notice are before this panel.

---

[6] The judge stated that the jury should consider whether the "witness had any relationship to the government," or "any bias or prejudice or reason for testifying that might cause the witness to lie or slant the testimony in favor of one side or the other." (JA 241.)

[7]*Brady v. Maryland*, 373 U.S. 83 (1963).

The government correctly observes that Federal Rule of Appellate Procedure 10(e), providing for "correction or modification of the record," is inapplicable by its terms.[8] Nevertheless, a court of appeals has discretionary authority to supplement the record with material not reviewed by the district court in special circumstances. *United States v. Murdock*, 398 F.3d 491, 499 (6th Cir. 2005). *Murdock* set forth several factors to be considered in deciding whether to exercise discretion and review documents outside the record:

> 1) whether proper resolution of the case was beyond any dispute,
> 2) whether it would be inefficient to remand to the district court for review of additional facts,
> 3) whether the opposing party had notice of the existence of the disputed evidence,
> 4) whether the case is before the court on a habeas corpus claim, because federal appellate judges have "unique powers" in that context.

*Murdock*, 398 F.3d at 500 (quoting *Dickerson v. State of Alabama*, 667 F.2d 1364, 1367 (11th Cir.), *cert denied*, 459 U.S. 878 (1982)).

Because consideration of the *Brady* issue requires no further factual development beyond the face of the plea agreement, the content of the agreement is undisputed, the government has been aware of the agreement since its entry, and it would be inefficient to fail to address the Brady issue in this appeal, we will deny the motion to strike and grant the motion to take judicial notice. Neeley

---

[8] F. R. App. 10(e) provides:

(2)     If anything material to either party is omitted from or misstated in the record by error or accident, the omission or misstatement may be corrected and a supplemental record may be certified and forwarded:

. . .

      C)     by the court of appeals.

argues that the government violated *Brady* by failing to turn over information related to the criminal investigation of Detective O'Bannon that could have been used to impeach O'Bannon during his trial testimony.

In *Brady,* the Supreme Court held that "[s]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "[I]t is well settled that this disclosure obligation includes evidence that could be used to impeach the credibility of a witness." *Carter*, 218 F.3d at 682 (quoting *Schledwitz v. United States*, 169 F.3d 1003, 1011 (6th Cir. 1999)). Thus, for Neeley to establish that the prosecution violated *Brady*, he must establish that the prosecutor (1) suppressed evidence (2) that was favorable to his defense, and (3) that the suppressed evidence was material. *Carter*, 218 F.3d at 682.

It is unclear from the record precisely what evidence the government possessed at the time of Neeley's trial. The plea agreement only makes reference to "an investigation in the Summer and Fall of 2006." (Addendum to Appellant's Reply Br. at 2.) There are no other facts, in the record or otherwise, concerning the specific dates of the investigation or precisely what information the government possessed in July 2006. The government argues that it has "no *Brady* obligation to

'communicate preliminary, challenged, or speculative information.'" *United States v. Amiel*, 95 F.3d

135 (2d Cir. 1996) (citing *United States v. Diaz*, 922 F.2d 998, 1006 (2d Cir. 1990)).[9]

It is unnecessary to resolve whether the government possessed sufficient information to give

rise to an obligation under *Brady*. Even assuming an obligation to disclose, Neeley cannot

demonstrate that the evidence at issue was material. Evidence is material when "there is a reasonable

probability that, had the evidence been disclosed to the defense, the result of the proceeding would

have been different." *Bagley*, 473 U.S. at 682. Here, there is no reasonable probability that the jury

would have come to a different conclusion had O'Bannon been impeached with his illegal conduct.

O'Bannon testified that when Neeley was arrested he made an inculpatory statement

acknowledging past involvement in procuring marijuana from Brownsville.[10] Even without this

---

[9]In his reply brief, Neeley goes to great lengths to distinguish his case from the facts in *Amiel*. He points out that in *Amiel*, the Second Circuit held that "the government wasn't required to disclose allegations regarding a government witness because after law enforcement investigated such alleged wrongdoing, it confirmed that he was not a suspect, was not arrested and the accusation against him was not credible. Herein, the opposite was true regarding O'Bannon. . . It is clear that ultimately the allegations that O'Bannon engaged in wrongdoing, which constitute admissible impeachment, proved true."

[10] O'Bannon testified:

| | |
|---|---|
| Gov't: | Now, during the course of your conversation with Mr. Neeley, was he advised of his rights? |
| O'Bannon: | He was, I advised him of his rights. |
| Gov't: | Did he indicate that he understood his rights? |
| O'Bannon: | He did. |
| Gov't: | Did he have any questions for you? |
| O'Bannon: | He did not have any questions or – about the rights I had read him, no. |
| Gov't: | Did you discuss with Mr. Neeley the purpose of your conversation? |
| O'Bannon: | Yes. |

testimony, the evidence of guilt was overwhelming. Seven witnesses testified that they wired money

provided by Neeley to Brownsville, Texas, as part of Neeley's marijuana trafficking organization.

In addition, extensive Western Union records confirmed the witnesses' testimony. Several Western

Union receipts were found in Neeley's house, along with the names and addresses of the individuals

who received the money in Texas. Finally, two witnesses testified that they received large packages

of marijuana for Neeley, and that they turned the packages over to him. If O'Bannon had not testified

at all regarding the inculpatory statement made by Neeley, there is a very high probability that the

outcome of the trial would have been the same. Further, O'Bannon's offenses involved an attempt

---

| Gov't: | And what did you say to him, please? |
|---|---|
| O'Bannon: | It was involving a drug investigation concerning money that was being sent to Brownsville, Texas, and – or to Texas, and dope that was coming from Brownsville, Texas, and his involvement. |
| Govt: | "Dope" being what, sir? |
| O'Bannon: | Marijuana. |
| Gov't: | Did you discuss with Mr. Neeley that you were actually talking about marijuana? |
| O'Bannon: | Yes. |
| Govt: | Now, what did Mr. Neeley say, sir? |
| O'Bannon: | He stated that he had received, in his words, dope from Brownsville, Texas. And during the conversation, it was — to me, he wanted to distance himself by saying it was in the past and that he had — the last time he had received those was when he lived in Indiana. |
| Gov't: | Okay, did you ask Mr. Neeley about who may have gotten him involved or how he got involved? |
| O'Bannon: | I did. He had responded that the person — he didn't give a name, but he responded that the person that got him involved in this was now deceased. |

(JA 120-21.)

to coerce sexual activity and cover up that attempt, rather than the fabrication of testimony. Thus, it had marginal relevance to the credibility of his testimony here. Accordingly, we **AFFIRM** defendant's conviction.