NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0592n.06

No. 08-4291

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Sep 02, 2010**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| v. | ) | DISTRICT OF OHIO |
| | ) | |
| **MARCUS COBB**, | ) | **O P I N I O N** |
| | ) | |
| *Defendant-Appellant*. | ) | |

BEFORE:    **COLE, CLAY**, Circuit Judges; **KATZ**, District Judge.[*]

**COLE, Circuit Judge.** Defendant-Appellant Marcus Cobb was convicted, following a jury trial, of five criminal counts related to the robberies of a Buca di Beppo restaurant and two banks in Columbus, Ohio. Cobb now appeals his convictions and sentence, alleging that the district court committed numerous errors that require reversal. We **AFFIRM**.

## I.  BACKGROUND

On September 6, 2007, Defendant-Appellant Marcus Cobb was charged in a five-count indictment with offenses related to three robberies. The first robbery took place on October 8, 2006, at the Buca di Beppo restaurant in Columbus, Ohio. After closing time, at around 12:43 a.m., Cobb demanded "all of your money" from the restaurant's assistant general manager. (Testimony of

---

[*] The Honorable David A. Katz, United States District Judge for the Northern District of Ohio, sitting by designation.

Debora Sue Curry, Dist. Ct. Docket No. 130 at 20.) The manager emptied the restaurant's safe and handed Cobb $2640 in a chef's hat. About five months after the robbery, the manager identified, with 70 percent certainty, Cobb as the robber via a photo array.

The second robbery occurred on January 26, 2007, at the Huntington National Bank in Upper Arlington, Ohio. Cobb approached a bank employee from behind in the parking lot as she was opening the bank for the day. He threatened her with a silver handgun and attempted to gain access to the bank. Upon gaining access, he ordered her and a second employee, Lois Kaufman, to open the bank's vault, stating: "You have 20 seconds to open the vault now, or it will be a murder/suicide." (Testimony of Lois Kaufman, Dist. Ct. Docket No. 128 at 15.) Cobb fled with $18,100. Four days after the robbery, Kaufman identified a different individual as the robber in a photo array. Police commenced an investigation of this individual, Timothy Rispress, before eliminating him as a suspect in the robbery. Testifying at a deposition the week before trial, Kaufman identified Cobb as the robber.

The final robbery happened on April 12, 2007, at the Chase Bank in Columbus. Cobb again approached a bank employee in the parking lot while she was opening the bank. He threatened her with a gun. When Cobb entered the bank, he told the two employees that were present to open the safe, stating that he had no "problem with a murder/suicide." (Testimony of Leah Krenciprock, Dist. Ct. Docket No. 136 at 84.) Cobb fled with $126,281 in the vehicle of one of the bank employees, Sean Hoselton, which later was recovered at a nearby fitness center. Next to the car, law enforcement recovered a glove that was tested for DNA.

Cobb proceeded to trial, after which the jury entered a verdict of guilty on all five counts: violation of the Hobbs Act, 18 U.S.C. § 1951; two counts of armed bank robbery, 18 U.S.C. § 2113(a) and (d); brandishing a firearm during a crime of violence, 18 U.S.C. § 924(c)(1)(A)(ii); and brandishing a firearm during a crime of violence (second offense), 18 U.S.C. § 924(c)(1)(C)(i). The district court summarized the government's evidence at trial as follows:

> During the prosecution of the Defendant, the Government relied on a variety of evidence. For example, the Government introduced videos and photographs taken from the robberies. These videos and photographs showed that in each of the robberies, the robber wore a blue sweatshirt with a yellow stripe down the side and in two of the robberies, a blue hat with distinctive stitching. The robbery victims testified that the videos and pictures accurately reflected what they remembered the robber wearing. A Government witness testified that these articles of clothing were recovered from Defendant's home. There were two in-court identifications by robbery eye-witness victims. Evidence was introduced revealing large cash purchases made by Defendant shortly after the robberies. The Government also relied on DNA evidence matching Defendant to a glove found near an abandoned car that was taken from the scene of one robbery.

(Op. and Order Regarding Mot. for New Trial, Dist. Ct. Docket No. 106 at 2.) Cobb was sentenced to a term of 1224 months incarceration.

He now challenges his convictions and sentence on multiple grounds.

## II. ANALYSIS

Cobb raises multiple arguments on appeal. We address first the three issues on which he focused at oral argument.

### A. Sufficiency of the evidence for brandishing a firearm conviction

Cobb argues that insufficient evidence supports his convictions for brandishing a firearm, in violation of 18 U.S.C. § 924(c), during the robberies of the Huntington and Chase banks.

Specifically, he contends that, because he used a pellet gun—as opposed to a real gun—during the Buca di Beppo robbery, the Government was obligated to provide a factual basis to suggest that he used a real gun in the latter two robberies. Because it failed to do so, Cobb argues, insufficient evidence supports his conviction on these two counts.

In reviewing a sufficiency of the evidence challenge, we ask whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Guthrie*, 557 F.3d 243, 253 (6th Cir. 2009). "We do not independently assess the credibility of witnesses or the weight of the evidence." *Guthrie*, 557 F.3d at 253. "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Barnett*, 398 F.3d 516, 522 (6th Cir. 2005) (citation and quotation marks omitted).

> The relevant statutory provision is 18 U.S.C. § 924(c), which defines "firearm" as
>
> (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3). Pellet guns, as Cobb points out, do not satisfy this definition. *See* U.S.S.G. § 1B1.1, note 1.G. ("A weapon, commonly known as a 'BB' or pellet gun, that uses air or carbon dioxide pressure to expel a projectile is a dangerous weapon but not a firearm.").

In this case, several witnesses testified that they saw a firearm during the bank robberies. Kaufman testified that she saw the robber approach her co-worker with "a big silver gun."

(Testimony of Lois Kaufman, Dist. Ct. Docket No. 128 at 15.)  When asked if the weapon appeared to be a real gun, Kaufman responded, "Oh, yes.  There was no doubt, the fear in his eyes, it was horrible."  (*Id.*)  Lisa Nichols, Kaufman's co-worker, also testified that she "saw the silver gun." (Testimony of Lisa Nichols, Dist. Ct. Docket No. 136 at 4.)  Leah Krenciprock, who was a teller at the Chase Bank, testified that the robber pointed a gun at her.  And her co-worker, Hoselton, testified that the robber had "a large silver gun" that was likely a "semi-automatic."  (Testimony of Sean Hoselton, Dist. Ct. Docket No. 132 at 4.)  Further, ATF Special Agent Craig Brenneman testified that:

> [I]t seemed to me that the weapon used in the Buca was not the same weapon that was used in the banks. . . . [W]hen you're looking at the video and some of the stills from the Buca robbery, you know, you can see the dark lower portion, the frame portion of the firearm as being dark, black, the upper portion being silver, the port of the gun.  The gun used in the, you know, in the Chase, in the Huntington, to me, looks like a different weapon.  It's silver completely.

(Testimony of Craig Brenneman, Dist. Ct. Docket No. 139 at 16.)

This evidence is sufficient for a rational trier of fact to have concluded that a real gun was used during the bank robberies.  As we have noted, "'[d]escriptive lay opinion testimony can be sufficient' to support a conviction under § 924." *United States v. Willis*, 232 F. App'x 527, 537 (6th Cir. 2007) (alteration in original) (quoting *United States v. Roberson*, 459 F.3d 39, 47 (1st Cir. 2006)).  "'Although § 924(c) requires proof that the gun is real, the government's proof need not reach a level of scientific certainty.'" *Id.*  (quoting *Roberson*, 459 F.3d at 47).  The evidence here includes more than lay opinion testimony; Special Agent Brenneman's testimony that the gun used in the bank robberies looks like a different weapon than the pellet gun used in the restaurant robbery

also supports the conclusion that the gun used in the bank robberies was real. Therefore, sufficient evidence supports Cobb's conviction. *See also United States v. Conner*, 306 F. App'x 978, 981 (6th Cir. 2009) (upholding § 924(c) conviction based on eyewitness testimony that defendant was holding a gun, surveillance footage showing defendant holding what appeared to be a gun, and testimony from co-defendant that she saw defendant throw what "looked like a gun").

**B.**     **Motion to suppress**

Cobb also appeals the denial of his suppression motion, claiming that the warrant authorizing the search of his home was not supported by probable cause. Cobb argues that the affidavit supporting the warrant failed to develop a sufficient nexus between the evidence sought and his residence.

*a.*     *Standard of review*

When reviewing a denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions—such as the existence of probable cause—de novo. *United States v. Williams*, 544 F.3d 683, 685 (6th Cir. 2008). We review the evidence "'in the light most likely to support the district court's decision.'" *United States v. Higgins*, 557 F.3d 381, 389 (6th Cir. 2009)(citation and quotation marks omitted). We review a magistrate judge's initial probable cause determination more deferentially. "[T]he traditional standard for review of an issuing magistrate's probable cause determination has been that so long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). We give an issuing magistrate judge's findings

of probable cause great deference, reversing only when its discretion is arbitrarily exercised. *Higgins*, 557 F.3d at 389.

### b. Probable cause standard

Probable cause may exist "when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Williams,* 544 F. 3d at 686. (quoting *United States v. Laughton*, 409 F.3d 744, 747 (6th Cir. 2005)). In making this determination, "the issuing judge must undertake a 'practical, common sense' evaluation of 'all of the circumstances set forth in the affidavit before him.'" *Id.* (citing *Laughton*, 409 F.3d at 747).

### c. Application

"'To justify a search, the circumstances must indicate why evidence of illegal activity will be found in a particular place.'" *United States v. Washington*, 380 F.3d 236, 240 (6th Cir. 2004) (quoting *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc)). "[T]he affidavit or warrant request must state a nexus between the place to be searched and the evidence sought." *Williams*, 544 F.3d at 686 (citations omitted). We have held repeatedly that the required nexus between evidence sought in a search and an individual's residence need not be based on direct evidence presented to the magistrate judge issuing the warrant. Rather, the nexus may be inferred. *See Higgins*, 557 F.3d at 391 ("This circuit's holdings indicate that a nexus between the place to be searched and the item to be seized may sometimes be inferred."); *Williams*, 544 F.3d at 686 ("[T]he courts may afford considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found and [the courts are] entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the crime and

type of offense.") (quotation marks and citation omitted); *id.* ("[A] bank robber would keep the proceeds and instrumentalities of his robbery in his home . . . .").

Here, Brenneman's warrant affidavit included his conclusions that individuals involved in serial robbery routinely maintain clothing and other items to conceal their identity, the cash proceeds of robberies, and firearms and ammunition to carry out robberies and that "these items are maintained in such places that they may be readily accessible, to include houses, apartments, and vehicles." (Application and Affidavit for Search Warrant ("Warrant Application"), J.A. at 31 ¶ 15.) Further, the affidavit set forth sufficient facts to permit the issuing judge to infer a link between the evidence sought and Cobb's residence. It noted that Cobb wore similar or the same clothing and used a similar or the same gun in both bank robberies. The reasonable inference is that this clothing and gun likely would have been in Cobb's possession six weeks following the final robbery (when the affidavit was signed) either to hide or potentially use in a future robbery. Also, the affidavit noted that Cobb took $100,000 in the Chase robbery, that he purchased a Jeep for $7000 the next day, and that, on May 21, 2007, he had a "huge amount of $100 bills on him." (*Id.* at 29-30 ¶ 7, 9, 11.) Again, the reasonable inference is that Cobb had a significant portion of the remaining funds in his control when the affidavit was signed on May 31, 2007.

In this way, the present case is distinguishable from *United States v. Bethal*, 245 F. App'x 460 (6th Cir. 2007). We affirmed the district court's decision to grant the motion to suppress in *Bethal* because "the affidavit only contained information connecting the appellant to two shootings; it did not include any facts connecting him to drugs or to weapons at his home other than his alleged status as a gang member and known acquaintance of the Parkers who reportedly kept drugs and guns

in *their* residence." *Id.* at 468. Since the affidavit here contained information connecting Cobb to weapons and other evidence likely to be found in his home, we affirm the district court's decision to deny Cobb's motion to suppress.

**C.     Detective Montag's testimony**

Cobb also argues that Detective Montag's testimony regarding the investigation and elimination of Timothy Rispress as a suspect in the Huntington Bank robbery was both impermissible opinion testimony and impermissible embedded hearsay. Defense counsel objected to the testimony on both of these grounds at trial and was overruled. We review evidentiary decisions of the trial court for abuse of discretion. *United States v. Olender*, 338 F.3d 629, 637 (6th Cir. 2003). An abuse of discretion occurs when "the district court relies on clearly erroneous findings of fact, improperly applies the law, or employs an erroneous legal standard." *United States v. Lopez-Medina*, 461 F.3d 724, 741 (6th Cir. 2006) (quotation marks and ellipses omitted). "Even when the district court has abused its discretion in admitting evidence, we do not reverse a conviction if the error is harmless . . . ." *Id.*

First, Cobb asserts that Montag's testimony regarding Rispress violated Cobb's due process rights because it was impermissible opinion testimony that usurped the role of the jury in determining guilt or innocence. In *Cooper v. Sowders*, we stated that permitting opinion testimony that directly influences a jury's consideration of guilt or innocence is constitutional error. 837 F.2d 284, 287 (6th Cir. 1988). In that case, a police officer testified that "[t]he only evidence we found that would link anyone to this crime would be [the defendant]." *Id.* We noted that "the police officer was [impermissibly] permitted to testify to his own, personal opinion that such evidence as

there was against other suspects was insufficient to justify their arrest . . . . This opinion suggests

to the jury the guilt of the accused and the innocence of other suspects." *Id.* (quotation marks

omitted).

Montag's testimony is distinguishable because it was primarily fact-based rather than

opinion-based and did not impermissibly suggest Cobb's guilt. Montag outlined the steps he

undertook to investigate Rispress's possible involvement in the Huntington robbery, including

interviewing the executive director of the Faith Mission Shelter, where Rispress was a resident;

interviewing Rispress; and deciding not to charge Rispress. Montag was cross-examined further two

days later, during which defense counsel questioned him in more depth about the investigation of

Rispress, which initially was prompted by Kaufman's photo-array identification of Rispess. Montag

explained that several staff members at Faith Mission noted that Rispress had a likeness to the

individual in photographs from the Huntington robbery. Further, Rispress showed up at the shelter

after the robbery with over $250 worth of gold teeth and had access to a vehicle. On re-direct,

Montag stated that he came to the conclusion that Rispress was not a "very intelligent person"

(Testimony of Heath Montag, Dist. Ct. Docket No. 133 at 13), and that, based on an image

comparison, "there is a very striking resemblance" between Rispress and Cobb, (*id.* at 14). When

asked why he discontinued his investigation of Rispress without bringing charges, Montag

responded:

> There is a variety of reasons. In speaking to all of the witnesses and associates of his
> fiancee, no one felt that he was capable of this type of robbery, or at least what had
> been released through the media, that he would not have the intelligence to carry this
> out. We never found any evidence that he had a firearm. The statements that were
> made to us about him having money or spending money were as a result through the

fiancee getting some money.  Now, these $250 gold teeth that he claimed to have at the shelter, we found out that he got them at a local mall for $20 or $25.  They were an imitation.

And lastly, to interview Mr. Rispress, while he is similar, has a striking resemblance, but his body type was not right.  He was a large man, but he was more of overweight instead of a muscular build.

(*Id.* at 14-15.)  While Montag's testimony explained the reasons why the Rispress investigation was discontinued, it did not "suggest[] to the jury the guilt of the accused." *Cooper*, 837 F.2d at 287 (citation omitted).  As such, we find that Montag's testimony was not impermissible opinion testimony.[1]

Second, Cobb argues that Montag's testimony constituted impermissible hearsay.  Because Cobb has insufficiently explained why this is the case, we find the argument waived. *See Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005) ("It is well-established that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (citation and quotation marks omitted)).

**D.      Sufficiency of the evidence for Huntington Bank robbery**

Cobb additionally argues that the evidence used to support his conviction under Count 2 for the armed robbery of the Huntington Bank is legally insufficient, in violation of Federal Rule of Criminal Procedure 29.  He contends that because Kaufman, who was working the morning of the

---

[1] Cobb further asserts the prejudicial effect of Montag's testimony was exacerbated by the government's improper closing remarks and tardy disclosure of the detective's investigative reports and that therefore any error was not harmless.  Since we conclude that the district court did not abuse its discretion in making the relevant evidentiary decisions, there is no need to reach the issue of harmlessness.

robbery, initially identified a different individual during a photo array, before identifying Cobb in person, and because no physical evidence linked Cobb to the Huntington Bank robbery, insufficient evidence supports his conviction. As explained above, in reviewing a sufficiency of the evidence challenge, we ask whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Guthrie*, 557 F.3d 243, 253 (6th Cir. 2009).

Here, Kaufman previously identified an individual other than Cobb as the Huntington Bank robber and testified that the robber was covered from head to toe and that all she could see were his eyes. Yet, at her deposition she made an in-person identification of Cobb as the robber. The jury's decision to credit the latter identification is not one that we can second guess on appeal. *See Guthrie*, 557 F.3d at 253 ("We do not independently assess the credibility of witnesses or the weight of the evidence.").

Furthermore, additional evidence supports Cobb's conviction for the Huntington Bank robbery. The Huntington robbery had a similar modus operandi to the robbery of the Chase Bank, in which DNA evidence supported Cobb's conviction. Both robberies occurred early in the morning, while bank employees were preparing the facilities for opening; the culprit in both robberies was wearing dark clothing that contained a green or yellow stripe; and the robber indicated on both occasions that he had no problem with a "murder/suicide." Brenneman testified that use of this unique phrase was "exceptionally important" in identifying a common suspect in the two robberies, since he had "never heard that phrased used" during his seven years in law enforcement. (Testimony

- 12 -

of Craig Brenneman, Dist. Ct. Docket No. 139 at 25.) In addition, a blue sweatshirt with a yellow stripe was recovered from Cobb's apartment, and Donna Thompson, Cobb's girlfriend at the time, counted somewhere between six and seven thousand dollars in a drawer in the bedroom that she shared with Cobb in January or February of 2007, around the time of the Huntington robbery. Thompson testified that she could not explain how the money appeared in her residence. Further, Thompson testified that Cobb paid $2000 as a down payment to purchase a Jeep in January 2007. As such, we find that sufficient evidence supports Cobb's conviction for the Huntington Bank robbery.[2]

### E.     District court denial of pretrial motions and other preliminary matters

Cobb makes several additional arguments regarding pretrial motions and other preliminary matters that were not the focus of oral argument. We discuss them now.

*1.        Failure to sever Hobbs Act robbery count from two armed-robbery counts*

Cobb argues that the Hobbs Act robbery count was joined improperly with the four counts relating to the bank robberies and should have been severed. We review questions of misjoinder de novo. *United States v. Deitz*, 577 F.3d 672, 692 (6th Cir. 2009). Moreover, "[w]e review the denial of a motion for severance under an abuse of discretion standard." *United States v. Tran*, 433 F.3d 472, 477 (6th Cir. 2006).

---

[2]Cobb's contention that the evidence was insufficient because no physical evidence tied him to the Huntington Bank robbery is not well taken. "'[P]hysical evidence is not required to sustain a conviction.'" *United States v. Willis*, 232 F. App'x 527, 536 (6th Cir. 2007) (alteration in original) (quoting *United States v. Davis*, 306 F.3d 398, 409 (6th Cir. 2002)).

Federal Rule of Criminal Procedure 8(a) governs whether multiple offenses may be joined in a single indictment. It states:

> The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Fed. R. Crim. P. 8(a). "In most cases, the absence of evidence at trial linking two sets of charges results in misjoinder only if the indictment was drawn up in bad faith – *i.e.* where the government knew it could not prove a link between the charges at trial." *Deitz*, 577 F.3d at 691. Indeed, the spirit of Rule 8(a) is to "promote the goals of trial convenience and judicial efficiency." *Tran*, 433 F.3d at 478 (quotation marks and citation omitted). Here, the Buca di Beppo robbery and bank robberies were of a similar character. In each robbery, Cobb approached a female employee, threatened to kill her, and brandished what appeared to be a gun. In addition, he wore similar or perhaps the same clothes. Furthermore, some of the same witnesses testified about the different counts. *Tran*, 433 F.3d at 478 ("[T]here was significant overlap of the witnesses presented on each offense."). We therefore find that the joinder of counts was proper under Rule 8(a).

Even if joinder of offenses is proper under Rule 8(a), a district court may order severance pursuant to Federal Rule of Criminal Procedure 14. That rule states:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a). Here, the district court denied Cobb's Rule 14 motion for severance. "The resolution of a Rule 14 motion is left to the sound discretion of the trial court and will not be

disturbed absent an abuse of that discretion." *Tran*, 433 F.3d at 478. "Rule 14(a) requires that the counts in an indictment be severed only when the defendant demonstrates that he will be prejudiced by the joinder of the charges." *Deitz*, 577 F.3d at 692. Here, Cobb has failed to show, or even allege, that he was prejudiced by the joinder of the offenses. Therefore, we affirm the district court's denial of Cobb's Rule 14 motion to sever.

2.      *Sufficiency of the indictment*

Cobb also argues that his indictment is insufficient because the robbery counts fail to allege mens rea, a requisite element of the offenses. "We review the sufficiency of an indictment de novo." *United States v. Combs*, 369 F.3d 925, 934 (6th Cir. 2004). "When an indictment goes unchallenged until appeal, it must be liberally construed in favor of its sufficiency." *Id.* "Furthermore, unless the defendant can show prejudice, a conviction will not be reversed when the indictment is first challenged on appeal unless the indictment cannot reasonably be construed to charge a crime." *Id.*

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). A sufficient indictment must: (1) "set out all of the elements of the charge[d] offense[s] and must give notice to the defendant of the charges he faces" and (2) "be sufficiently specific to enable the defendant to plead double jeopardy in a subsequent proceeding, if charged with the same crime based on the same facts." *United States v. Kuehne*, 547 F.3d 667, 696 (6th Cir. 2008) (quotation marks omitted).

We have determined that both Hobbs Act violations and bank robberies are specific intent crimes; intent is an essential element of each offense despite the fact that it is not mentioned in the

crimes' statutory definitions. *United States v. Dabish*, 708 F.2d 240, 242 (6th Cir. 1983) (Hobbs Act); *United States v. Beasley*, 438 F.2d 1279, 1282 (6th Cir. 1971) (bank robbery).

Liberally construed, we find Cobb's indictment sufficient. Although it does not allege intent, it does cite the appropriate sections of the United States Code—18 U.S.C. § 1951 and 18 U.S.C. §§ 2113(a) and (d)—thereby providing notice to Cobb of the charges, and specifies the particular dates and locations of the offenses sufficient to protect against double jeopardy. *See United States v. Martinez*, 981 F.2d 867, 872 (6th Cir. 1992) (holding indictment sufficient because "although [it] does not expressly allege willfulness, it does allege the appropriate sections of the United States Code"); *Kuehne*, 547 F.3d at 696 (finding indictment sufficient despite failure to allege a requisite element of crime where indictment tracked relevant statutory language and was sufficiently specific to provide protection against double jeopardy).

**F.      Trial issues**

Cobb makes several additional arguments regarding the evidence admitted at trial. We address them now.

*1.      Admission of opinion and hearsay testimony*

First, Cobb challenges the admission of testimony that he claims was improper opinion.

*a.      Testimony that three robberies shared common modus operandi*

In addition to the argument regarding Detective Montag's testimony that Cobb focused on at oral argument, Cobb also argues that the district court erred in permitting Brenneman to testify regarding the modus operandi similarities among the three robberies. Specifically, Cobb asserts that because Brenneman's testimony went beyond describing the general methods and techniques of

serial robbers by including Brenneman's own subjective opinions, it was improper expert opinion

testimony. Brenneman testified to the following:

> You know, every robber is different, but, you know, I don't think signature is the way to put it, but, you know, people, even criminals, all human beings, I think, have tendencies to do certain things in certain ways, and I don't think, you know, that a suspect in a robbery is any different. They do what's familiar and what they're comfortable with. So, you know, I guess what I'm saying is that, when I'm looking at these photographs, I see this disguise, and, to me, it's not – you know, I've worked numerous robbery cases where suspects wore bandanas.
>
> Okay. You can wear a bandana around your neck and pull it up just like this (indicating), but this was draping. I don't know if that's the right way to put it, but, you know, it was like a shirt or some other shirt-sized object, tied. It looked to me – it appeared to me as if it was tied behind his head, like this (indicating).
>
> And, so, you've got the hat pulled down, and you've got this tied over his face, and it's draping down his chest. So, this is what – this is what I'm seeing, and I'm talking to Detective Franken, and we're discussing this very issue. At that point, you know, we're like, you know, this looks like Bucca, which is, you know, the Bucca di Beppo, the robbery case that we were already involved in investigating.

(Dist. Ct. Docket No. 139 at 5-6.) He further testified:

> When a restaurant is closed or a bank is closed, you don't have customers, or you typically don't have any customers there, and you have a limited number of employees, which, you know, from my perspective, for the robber, what that creates is a more immediate span of control. He has more control over what he's trying to accomplish.
>
> So, there's thought that goes into this stuff, and that's the kind of stuff that we look at when we're trying to figure out whether these things are connected or not connected. So, there are other things, but this is just kind of a sketch of why I think that those two robberies, even though one was at opening – two were at opening and one was at closing – is that it still kind of implies a set of standards or conditions that the suspect is looking for when he's going to commit a robbery.

(*Id.* at 26.) Because defense counsel failed to object to this testimony at trial, our review is limited

to plain error. *Lopez-Medina*, 461 F.3d at 743.

We conclude that the district court did not err, let alone plainly err. First, we have noted that law enforcement officers may offer expert testimony regarding the modus operandi of crimes. "Law enforcement officers may testify concerning the methods and techniques employed in an area of criminal activity and to establish 'modus operandi' of particular crimes. Knowledge of such activity is generally 'beyond the understanding of the average layman.'" *United States v. Pearce*, 912 F.2d 159, 163 (6th Cir. 1990) (quoting *United States v. Espinosa*, 827 F.2d 604, 611 (9th Cir. 1987)). If a witness's qualifications are obvious, we have found that there is no need to formally qualify him as an expert. *United States v. Neeley*, 308 F. App'x 870, 877 (6th Cir. 2009). Such was the case here, where Brenneman testified that he had been a special agent with AFT for seventeen years and that his current work involves investigating armed serial business-robberies. *See Lopez-Medina*, 461 F.3d at 743 (finding no abuse of discretion in failing to formally qualify witnesses as experts who had seventeen and six years of DEA employment experience, respectively). Second, like Detective Montag's testimony discussed above, Agent Brenneman did not invade the province of the jury; he did not "suggest[] to the jury the guilt of the accused and the innocence of other suspects." *Cooper*, 837 F.2d at 287. Rather, Brenneman specifically testified that others could reasonably disagree with his opinion regarding the modus operandi of the three robberies: After being asked on cross-examination, "notwithstanding your experience in law enforcement, you would agree with me that someone else may be free to conclude differently than you have as to the relationships between the robberies," Brenneman answered, "Yes, that's fair." (Dist. Ct. Docket No. 139 at 53.)

We therefore find that the district court did not err in permitting Brenneman's testimony.

> b.       *Lack of jury instruction regarding fact and expert witness testimony*

Relatedly, Cobb argues that the district court erred by failing to give a cautionary instruction

to the jury regarding Montag's and Brenneman's dual roles as fact and expert witnesses.  Because

defense counsel did not object at trial, we review for plain error.  *Lopez-Medina*, 461 F.3d at 743.

We have noted that "when a police officer testifies in two different capacities in the same

case, there is a significant risk that the jury will be confused by the officer's dual role," and the

district court, therefore, should "take care to assure that the jury is informed of the dual roles of a law

enforcement officer as a fact witness and an expert witness, so that the jury can give proper weight

to each type of testimony." *United States v. Thomas*, 74 F.3d 676, 682-83 (6th Cir. 1996) abrog. on

other grounds recognized by *Morales v. Am. Honda Motor Co. Inc.*, 151 F.3d 500 (6th Cir. 1998)

As noted above, Montag did not testify as an expert; rather, his testimony was limited to factual

development and limited lay-person opinion.  *See United States v. Perkins*, 470 F.3d 150, 156 (4th

Cir. 2006) (classifying officer testimony based on contemporaneous perceptions as lay opinion

testimony).  Therefore, a cautionary jury instruction was not necessary with regards to his testimony.

Although Brenneman was not offered as an expert witness, his testimony did include limited

expert opinion.  However, the district court offered the following jury instructions:

> The testimony of law enforcement officers.  You have heard testimony from at least
> one law enforcement officer.  The fact that a witness may be employed by the state
> or federal government as a law enforcement official does not mean that his or her
> testimony is necessarily deserving of more or less consideration or greater or lesser
> weight than that of an ordinary witness.  It is your decision, after viewing all of the
> evidence, whether to accept the testimony of the law enforcement witness and to give
> to that testimony whatever weight you find it deserves.

(Dist. Ct. Docket No. 134 at 13.)  And:

Opinion testimony credibility. You have heard testimony from an opinion witness. An opinion witness is one who, by knowledge, skill, experience, training, or education, has specialized knowledge in some art, science, profession or calling. An opinion witness is allowed to express his or her opinion on those matters about which he or she has special knowledge and training.

Opinion witness testimony is presented to you on the theory that someone is experienced in the field and can assist you in understanding the evidence or in reaching an independent decision on the facts.

You may consider the opinions received in evidence in this case and give it such weight as you think it deserves. If you decide that the opinions are not based upon sufficient knowledge, skill, experience, training or education, or that the reasons given in support of the opinions are not sound, or that the opinion is outweighed by other evidence, you may disregard the opinion entirely. Likewise, you may disregard the opinion witness if you decide that any assumptions of fact upon which the opinion is based are not established by the evidence.

You may give the opinion witness testimony whatever weight, if any, that you find it deserves in light of all of the evidence in the case. In your daily life, you are constantly determining who is worthy of belief and who is not. Employ the same tests in determining the weight and credibility, if any, that you will assign to the testimony of each witness.

(*Id.* at 14-15.) The court's instruction on opinion testimony sufficiently "guard[s] against a jury mistakenly weighing opinion testimony as if the opinion were fact" and "instruct[s] the jury that they are free to reject the opinions given." *Lopez-Medina*, 461 F.3d at 744. As such, we find that the district court did not commit plain error by failing to provide a specific jury instruction regarding Montag's and Brenneman's dual roles as fact and expert witnesses.

2.      *Admission of DNA expert without foundation*

Cobb argues that the district court also erred in admitting the testimony of the Government's DNA expert without an adequate foundation. Specifically, Cobb contends that the Government failed to establish the scientific validity and reliability of the statistical methods used by the

laboratory. Cobb objected to the DNA evidence at trial on different grounds; therefore, we review

his present argument only for plain error. *See Lopez-Medina*, 461 F.3d at 743. To show plain error,

Cobb must show (1) error (2) that was obvious or clear (3) that affected his substantial rights and (4)

that affected the fairness, integrity, or public reputation of judicial proceedings. *United States v.*

*Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc). The lack of foundational questions about the

scientific validity and reliability of the expert's statistical methods was not plain error: The error did

not affect the trial's outcome since the relevant foundation could have been established; therefore,

Cobb's substantial rights were not affected. *See Perkins*, 470 F.3d at 156 (finding opinion testimony

admitted without foundation did not affect outcome of trial because of presence of other admissible

evidence and fact that opinion testimony could have been properly offered in the first instance);

*United States v. Bonds*, 12 F.3d 540, 568 (6th Cir. 1993) (finding DNA testing to be scientifically

valid and reliable).

> 3.      *Firearm jury instruction*

Cobb next argues that the district court erred in refusing to instruct the jury that a pellet gun

does not qualify as a firearm for purposes of the firearm counts of Cobb's indictment. The district

court explained its decision to leave out Cobb's proposed instruction as follows:

> Well, the evidence we've heard is that the gun used in the Bucca robbery was not a
> firearm, and, however, the defendant is not charged with the firearm 924(c) count
> with respect to the robbery. And we've not heard any testimony that the guns used
> during the Huntington Chase Bank robberies were not firearms.
>
> The Court concludes that adding the requested jury instruction would cause jury
> confusion as to the instruction. . . . A firearm is defined with respect to those counts
> in accordance with the Sixth Circuit.

(Dist. Ct. Docket No, 139 at 65.)  We apply the following standard of review:

> A district court's refusal to deliver a requested instruction is reversible error only if the instruction (1) is a correct statement of the law, (2) is not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense.

*United States v. DeSantis*, 134 F.3d 760, 768 (6th Cir. 1998).  We conclude that the requested instruction was substantially covered by the instruction that was given.  The district court instructed the jury as follows:

> The term "firearm" means any weapon which will or is designed to or may readily be converted to expel a projectile by the action of an explosive.
>
> The term "firearm" also includes the frame or receiver of any such weapon, and any firearm, muffler or firearm silencer, and any destructive device.
>
> The term "firearm" does not include an antique firearm.  The term "firearm" includes starter guns.  The firearm need not be loaded.

(Dist. Ct. Docket No. 134 at 26.)  That a pellet gun does not satisfy the definition of a "firearm" is substantially covered by the language "designed to or may readily be converted to expel a projectile by the action of an explosive."  We therefore find that the district court's refusal to deliver the requested instruction was not reversible error.

**G.     Motion for new trial**

Cobb next argues that the district court erred in denying his motion pursuant to Federal Rule of Criminal Procedure 33 for a new trial based on newly discovered evidence.  *See* Fed. R. Crim. P. 33(b)(1).  Cobb's motion was based on counsel's post-trial discovery that Cobb's DNA expert had not been provided with electronic data from the April 2007 and August 2007 DNA tests when performing his re-analysis; rather, he had relied exclusively on hard data when conducting the re-

analysis. Rule 33 permits the district court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). We review a denial of a motion for a new trial for abuse of discretion. *United States v. Jones*, 399 F.3d 640, 647 (6th Cir. 2005).

To obtain a new trial based on newly discovered evidence, "a defendant must show the following: '(1) the new evidence was discovered after the trial; (2) the evidence could not have been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce acquittal.'" *United States v. Carson*, 560 F.3d 566, 585 (6th Cir. 2009) (quoting *United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991)).

This case involved three DNA tests: (1) the April 2007 test, which extracted DNA from the glove found near the abandoned car stolen at the Chase robbery scene; (2) the June 2007 test, which was performed on a DNA sample provided by Cobb; and (3) the August 2007 test, which was performed on a DNA sample provided by Cobb's former girlfriend, Donna Thompson. According to the Government's DNA expert, the DNA extracted from the glove matched the DNA sample provided by Cobb. Cobb advances no argument that there was a DNA mix-up or that the Government's DNA expert used improper testing methods.

The district court found that Cobb could not satisfy the final three prongs of the newly discovered evidence analysis. First, he failed to explain why the faulty disk could not have been discovered before trial—"If the electronic data (as compared to the underlying hard copies of the data) is as critical to performing a re-analysis as Defendant's counsel now suggests, then surely Defendant's DNA expert would have made Defendant's counsel aware of his inability to access the electronic data on the disk he had been provided." (Dist. Ct. Docket No. 106 at 6; *see also*

Sentencing Tr., Dist. Ct. Docket No. 124 at 3 ("There's one letter that indicates that notice was given to the defense, I believe, on April 29th, 2007, this was a few weeks before trial, that there was a problem with the CD disk that contained the raw data, that it could not be retrieved by the expert employed by the defense.")). Second, he failed to show that the discovery that his DNA expert could not access the electronic back-up files from the April 2007 and August 2007 DNA tests when performing his DNA re-analysis was material since the DNA expert was able to complete an evaluation of the DNA tests without the electronic data, despite the fact that the lack of electronic data did not permit a re-testing of the glove. And finally, Cobb failed to demonstrate that the post-trial discovery likely would result in an acquittal for the same reasons that the discovery is not material.

We agree and find that the district court did not abuse its discretion in denying Cobb's Rule 33 motion.

**H.     Reasonableness of sentence**

Finally, Cobb argues that his sentence is both procedurally and substantively unreasonable.

*1.     Procedural Reasonableness*

Procedurally, Cobb contends that the district court erred in counting his 1991 felonious assault conviction toward his classification as a career offender. We review de novo the district court's interpretation of the Sentencing Guidelines. *United States v. Galvan*, 453 F.3d 738, 739 (6th Cir. 2006).

According to U.S. Sentencing Guidelines Manual § 4B1.1(a), a defendant is a career offender if:

> (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1(a). A prior conviction counts only if (i) imprisonment exceeding one year and one month was imposed within fifteen years of the defendant's commencement of the instant offense or (ii) if imprisonment exceeding one year and one month, whenever imposed, resulted in the defendant being incarcerated during any part of such fifteen-year period. U.S.S.G. § 4A1.2(e)(1). "'"In the case of a prior revocation of probation . . . [or] parole . . . [the sentencing court should] add the original term of imprisonment to any term of imprisonment imposed upon revocation.'"" *United States v. Anderson*, 333 F. App'x 17, 25 (6th Cir. 2009) (quoting *United States v. Shannon*, 449 F.3d 1146, 1148 (11th Cir. 2006) (quoting U.S.S.G. § 4A1.2(k)(1))). "Thus, a conviction that is imposed resulting in a sentence of imprisonment for thirteen months or more, and on which the defendant is paroled outside the fifteen-year window, is counted for the purposes of career offender status if the defendant is later incarcerated within the fifteen-year window for breaching the conditions of his parole." *Id.*

Here, Cobb served eight months in prison for his 1991 felonious assault conviction before being released on five years of shock probation. His probation was revoked, and his original sentence imposed, in December 2001. Cobb again was released on parole in 2006; his sentence expired the following year. Therefore, the four plus years that Cobb served in prison from 2001 to 2006 count for purposes of career offender status: Cobb's original sentence for felonious assault was for thirteen years or more (four to fifteen years imprisonment; more than five of which were served);

- 25 -

he was paroled outside the fifteen-year window (in 1992); and he later was incarcerated within the fifteen-year window for violating the terms of his probation (in 2001). *See Anderson*, 333 F. App'x at 25.

Cobb additionally argues that his 2001 probation revocation was ineffective under state law because the state court's subject-matter jurisdiction expired once the initial five-year term of probation ended, which happened in 1997. *See Ohio v. Jackson*, 565 N.E.2d 848, 849 (Ohio App. 1988). But any such jurisdictional defect is not indicated on the face of the federal record and we have held previously that district courts are "not required to search beyond the record" in sentencing cases. *Galvan*, 453 F.3d at 741. Accordingly, this argument must fail.

We therefore conclude that Cobb's sentence was procedurally reasonable.

### 2.    *Substantive Reasonableness*

Additionally, Cobb argues that his sentence is substantively unreasonable because he is 38 years old and a sentence of 102 years (1224 months) is tantamount to a term of life imprisonment, greater than necessary to satisfy the objectives of a robbery sentence. We review substantive reasonableness under an abuse-of-discretion standard. *United States v. Higgins*, 557 F.3d 381, 397 (6th Cir. 2009). "We have held that within-Guidelines sentences are presumed reasonable." *Id.* at 398. The Guideline range for Counts 1 through 4 is 360 months to life, to be served consecutively to the mandatory minimum of 300 months for Count 5. We therefore find that the sentence of 1224 months, which falls within this range, is substantively reasonable.

### III.  CONCLUSION

For these reasons, we **AFFIRM** Cobb's convictions and sentence.